99 U.S. 700 (____)
SINKING-FUND CASES.
UNION PACIFIC RAILROAD COMPANY
v.
UNITED STATES.
CENTRAL PACIFIC RAILROAD COMPANY
v.
GALLATIN.
Supreme Court of United States.

*718 Mr. Samuel Shellabarger and Mr. Jeremiah M. Wilson for the Union Pacific Railroad Company.
The Attorney-General and Mr. Edwin B. Smith, Assistant Attorney-General, for the United States.
Mr. Benjamin H. Hill and Mr. S.W. Sanderson for the Central Pacific Railroad Company, and Mr. George H. Williams for Gallatin.
MR. CHIEF JUSTICE WAITE delivered the opinion of the court.
The single question presented by the case of the Union Pacific Railroad Company is as to the constitutionality of that part of the act of May 7, 1878, which establishes in the treasury of the United States a sinking-fund. The validity of the rest of the act is not necessarily involved.
It is our duty, when required in the regular course of Judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.
The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States they are prohibited *719 from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bonds by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable.
The contract of the company in respect to the subsidy bonds is to pay both principal and interest when the principal matures, unless the debt is sooner discharged by the application of one-half the compensation for transportation and other services rendered for the government, and the five per cent of net earnings as specified in the charter. This was decided in Union Pacific Railroad Co. v. United States, 91 U.S. 72. The precise point to be determined now is, whether a statute which requires the company in the management of its affairs to set aside a portion of its current income as a sinking-fund to meet this and other mortgage debts when they mature, deprives the company of its property without due process of law, or in any other way improperly interferes with vested rights.
This corporation is a creature of the United States. It is a private corporation created for public purposes, and its property is to a large extent devoted to public uses. It is, therefore, subject to legislative control so far as its business affects the public interests. Chicago, Burlington, & Quincy Railroad Co. v. Iowa, 94 U.S. 155.
It is unnecessary to decide what power Congress would have had over the charter if the right of amendment had not been reserved; for, as we think, that reservation has been made. In the act of 1862, sect. 18, it was accompanied by an explanatory *720 statement showing that this had been done "the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but especially in time of war) the use and benefits of the same for postal, military, and other purposes," and by an injunction that it should be used with "due regard for the rights of said companies." In the act of 1864, however, there is nothing except the simple words (sect. 22) "that Congress may at any time alter, amend, and repeal this act." Taking both acts together, and giving the explanatory statement in that of 1862 all the effect it can be entitled to, we are of the opinion that Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power. That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made; but, as was said by this court, through Mr. Justice Clifford, in Miller v. The State (15 Wall. 498), "it may safely be affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of stockholders and of creditors, and for the proper disposition of its assets;" and again, in Holyoke Company v. Lyman (id. 519), "to protect the rights of the public and of the corporators, or to promote the due administration of the affairs of the corporation." Mr. Justice Field, also speaking for the court, was even more explicit when, in Tomlinson v. Jessup (id. 459), he said, "the reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the State;" and again, as late as Railroad Company v. Maine (96 U.S. 510), "by the reservation ... the State retained the power to alter it [the charter] in all particulars constituting the grant to the new company, *721 formed under it, of corporate rights, privileges, and immunities." Mr. Justice Swayne, in Shields v. Ohio (95 U.S. 324), says, by way of limitation, "The alterations must be reasonable; they must be made in good faith, and be consistent with the object and scope of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration." The rules as here laid down are fully sustained by authority. Further citations are unnecessary.
Giving full effect to the principles which have thus been authoritatively stated, we think it safe to say, that whatever rules Congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into. It might originally have prohibited the borrowing of money on mortgage, or it might have said that no bonded debt should be created without ample provision by sinking-fund to meet it at maturity. Not having done so at first, it cannot now by direct legislation vacate mortgages already made under the powers originally granted, nor release debts already contracted. A prohibition now against contracting debts will not avoid debts already incurred. An amendment making it unlawful to issue bonds payable at a distant day, without at the same time establishing a fund for their ultimate redemption, will not invalidate a bond already out. All such legislation will be confined in its operation to the future.
Legislative control of the administration of the affairs of a corporation may, however, very properly include regulations by which suitable provision will be secured in advance for the payment of existing debts when they fall due. If a State under its reserved power of charter amendment were to provide that no dividends should be paid to stockholders from current earnings until some reasonable amount had been set apart to meet maturing obligations, we think it would not be seriously contended that such legislation was unconstitutional, either because *722 it impaired the obligations of the charter contract or deprived the corporation of its property without due process of law. Take the case of an insurance company dividing its unearned premiums among its stockholders without laying by any thing to meet losses, would any one doubt the power of the State under its reserved right of amendment to prohibit such dividends until a suitable fund had been established to meet losses from outstanding risks? Clearly not, we think, and for the obvious reason that while stockholders are entitled to receive all dividends that may legitimately be declared and paid out of the current net income, their claims on the property of the corporation are always subordinate to those of creditors. The property of a corporation constitutes the fund from which its debts are to be paid, and if the officers improperly attempt to divert this fund from its legitimate uses, justice requires that they should in some way be restrained. A court of equity would do this, if called upon in an appropriate manner; and it needs no argument to show that a legislative regulation which requires no more of the corporation than a court would compel it to do without legislation is not unreasonable.
Such a regulation, instead of being destructive in its character, would be eminently conservative. Railroads are a peculiar species of property, and railroad corporations are in some respects peculiar corporations. A large amount of money is required for construction and equipment, and this to a great extent is represented by a funded debt, which, as well as the capital stock, is sought after for investment, and is distributed widely among large numbers of persons. Almost as a matter of necessity it is difficult to secure any concert of action among the different classes of creditors and stockholders, and consequently all are compelled to trust in a great degree to the management of the corporation by those who are elected as officers, without much, if any, opportunity for personal supervision. The interest of the stockholders, who, as a rule, alone have the power to select the managers, is not unfrequently antagonistic to those of the debt-holders, and it therefore is especially proper that the government, whose creature the corporation is, should exercise its general powers of supervision and do all it reasonably may to protect investments in the *723 bonds and stock from loss through improvident management.
No better case can be found for illustration than is presented by the history of this corporation. Without undertaking in any manner to cast censure upon those by whose matchless energy this great road was built and, as if by magic, put into operation, it is a fact which cannot be denied, that, when the road was in a condition to be run, its bonds and stocks represented vastly more than the actual cost of the labor and material which went into its construction. Great undertakings like this, whose future is at the time uncertain, requiring as they do large amounts of money to carry them on, seem to make it necessary that extraordinary inducements should be held out to capitalists to enter upon them, since a failure is almost sure to involve those who make the venture in financial ruin. It is not, however, the past with which we are now to deal, but rather the present and the future. We are not sitting in judgment upon the history of this corporation, but upon its present condition. We now know that when the road was completed its funded debt alone was as follows: First mortgage, $27,232,000, subsidy bonds, $27,236,512, all maturing thirty years after date, and that the average time of its maturity is during the year 1897. In addition to this are now the sinking-fund bonds, the land-grant bonds, and the Omaha-bridge bonds, amounting to at least $20,000,000 more. The interest on the first mortgage and all other classes of bonds, except the subsidy bonds, will undoubtedly be met as it falls due; but on the subsidy bonds, as has already been seen, no interest is payable, except out of the half of the earnings for government service and the five per cent of net earnings, until the maturity of the principal. Thus far, as we have had occasion to observe in the various suits which have come before us during the past few years, involving an inquiry into these matters, the payments from these sources have fallen very far short of keeping down the accruing interest, and according to present appearances it is not probably too much to say that when the debt is due there will be as much owing the United States for interest paid as for principal. There will then become due from this company, in less than twenty years from this date, in the neighborhood *724 of $80,000,000, secured by the first and subsidy mortgages. In addition to this are the capital stock, representing $36,000,000 more, and the funded debt inferior in its lien to that of the subsidy bonds. All these different classes of securities have become favorites in the market for investments, and they are widely scattered at home and abroad. They have taken to a certain extent the place of the public funds as investments. With the exception of the land-grant, which is first devoted to the payment to the land-grant bonds, but little if any thing except the earnings of the company can be depended on to meet these obligations when they mature. The company has been in the receipt of large earnings since the completion of its road, and, after paying the interest on its own bonds at maturity, has been dividing the remainder, or a very considerable portion of it, from time to time among its stockholders, without laying by any thing to meet the enormous debt which, considering the amount, is so soon to become due. It is easy to see that in this way the stockholders of the present time are receiving in the shape of dividends that which those of the future may be compelled to lose. It is hardly to be presumed that this great weight of pecuniary obligation can be removed without interfering with dividends hereafter, unless at once some preparation is made by sinking-fund or otherwise to prevent it. Under these circumstances, the stockholders of to-day have no property right to dividends which shall absorb all the net earnings after paying debts already due. The current earnings belong to the corporation, and the stockholders, as such, have no right to them as against the just demands of creditors.
The United States occupy towards this corporation a twofold relation,  that of sovereign and that of creditor. United States v. Union Pacific Railroad Co., 98 U.S. 569. Their rights as sovereign are not crippled because they are creditors, and their privileges as creditors are not enlarged by the charter because of their sovereignty. They cannot, as creditors, demand payment of what is due them before the time limited by the contract. Neither can they, as sovereign or creditors, require the company to pay the other debts it owes before they mature. But out of regard to the rights of the subsequent lienholders *725 and stockholders, it is not only their right, but their duty, as sovereign to see to it that the current stockholders do not, in the administration of the affairs of the corporation, appropriate to their own use that which in equity belongs to others. A legislative regulation which does no more than require them to submit to their just contribution towards the payment of a bonded debt cannot in any sense be said to deprive them of their property without due process of law.
The question still remains, whether the particular provision of this statute now under consideration comes within this rule. It establishes a sinking-fund for the payment of debts when they mature, but does not pay the debts. The original contracts of loan are not changed. They remain as they were before, and are only to be met at maturity. All that has been done is to make it the duty of the company to lay by a portion of its current net income to meet its debts when they do fall due. In this way the current stockholders are prevented to some extent from depleting the treasury for their own benefit, at the expense of those who are to come after them. This is no more for the benefit of the creditors than it is for the corporation itself. It tends to give permanency to the value of the stock and bonds, and is in the direct interest of a faithful administration of affairs. It simply compels the managers for the time being to do what they ought to do voluntarily. The fund to be created is not so much for the security of the creditors as the ultimate protection of the public and the corporators.
To our minds it is a matter of no consequence that the Secretary of the Treasury is made the sinking-fund agent and the treasury of the United States the depository, or that the investment is to be made in the public funds of the United States. This does not make the deposit a payment of the debt due the United States. The duty of the manager of every sinking-fund is to seek some safe investment for the moneys as they accumulate in his hands, so that when required they may be promptly available. Certainly no objection can be made to the security of this investment. In fact, we do not understand that complaint is made in this particular. The objection is to the creation of the fund and not to the investment, if that investment is not in law a payment.
*726 Neither is it a fatal objection that the half of the earnings for services rendered the government, which by the act of 1864 was to be paid to the companies, is put into this fund. The government is not released from the payment. While the money is retained, it is only that it may be put into the fund, which, although kept in the treasury, is owned by the company. When the debts are paid, the securities into which the moneys have been converted that remain undisposed of must be handed over to the corporation. Under the circumstances, the retaining of the money in the treasury as part of the sinking-fund is in law a payment to the company.
Not to pursue this branch of the inquiry any further, it is sufficient now to say that we think the legislation complained of may be sustained on the ground that it is a reasonable regulation of the administration of the affairs of the corporation, and promotive of the interests of the public and the corporators. It takes nothing from the corporation or the stockholders which actually belongs to them. It oppresses no one, and inflicts no wrong. It simply gives further assurance of the continued solvency and prosperity of a corporation in which the public are so largely interested, and adds another guaranty to the permanent and lasting value of its vast amount of securities.
The legislation is also warranted under the authority by way of amendment to change or modify the rights, privileges, and immunities granted by the charter. The right of the stockholders to a division of the earnings of the corporation is a privilege derived from the charter. When the charter and its amendments first became laws, and the work on the road was undertaken, it was by no means sure that the enterprise would prove a financial success. No statutory restraint was then put upon the power of declaring dividends. It was not certain that the stock would ever find a place on the list of marketable securities, or that there would be any bonds subsequent in lien to that of the United States which could need legislative or other protection. Hence, all this was left unprovided for in the charter and its amendments as originally granted, and the reservation of the power of amendment inserted so as to enable the government to accommodate its legislation to the requirements *727 of the public and the corporation as they should be developed in the future. Now it is known that the stock of the company has found its way to the markets of the world; that large issues of bonds have been made beyond what was originally contemplated, and that the company has gone on for years dividing its earnings without any regard to its increasing debt, or to the protection of those whose rights may be endangered if this practice is permitted to continue. For this reason Congress has interfered, and, under its reserved power, limited the privilege of declaring dividends on current earnings, so as to confine the stockholders to what is left after suitable provision has been made for the protection of creditors and stockholders against the disastrous consequences of a constantly increasing debt. As this increase cannot be kept down by payment unless voluntarily made by the corporation, the next best thing has been done, that is to say, a fund safely invested, which increases as the debt increases, has been established and set apart to meet the debt when the time comes that payment can be required.
The only material difference between the Central Pacific Company and the Union Pacific lies in the fact that in the case of the Central Pacific the special franchises, as well as the land and subsidy bonds, were granted by the United States to a corporation formed and organized under the laws of California, while in that of the Union Pacific Congress created the corporation to which the grants were made. The California corporation was organized under a State law with an authorized capital of $8,500,000, to build a road from the city of Sacramento to the eastern boundary of the State, a distance of about one hundred and fifteen miles. Under the operation of its California charter, it could only borrow money to an amount not exceeding the capital stock, and must provide a sinking-fund for the ultimate redemption of the bonds. Hittell's Cal. Laws, 1850-64, sect. 840. No power was granted to build any road outside the State, or in the State except between the termini named. By the act of 1862, Congress granted this corporation the right to build a road from San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of the State, and from there through *728 the Territories of the United States until it met the road of the Union Pacific Company. For this purpose all the rights, privileges, and franchises were given this company that were granted the Union Pacific Company, except the franchise of being a corporation, and such others as were merely incident to the organization of the company. The land-grants and subsidy bonds to this company were the same in character and quantity as those to the Union Pacific, and the same right of amendment was reserved. Each of the companies was required to file in the Department of the Interior its acceptance of the conditions imposed, before it could become entitled to the benefits conferred by the act. This was promptly done by the Central Pacific Company, and in this way that corporation voluntarily submitted itself to such legislative control by Congress as was reserved under the power of amendment.
No objection has ever been made by the State to this action by Congress. On the contrary, the State, by implication at least, has given its assent to what was done, for in 1864 it passed "An Act to aid in carrying out the provisions of the Pacific railroad and telegraph act of Congress," and thereby confirmed and vested in the company "all the rights, privileges, franchises, power, and authority conferred upon, granted to, or vested in said company by said act of Congress," and repealed "all laws or parts of laws inconsistent or in conflict with ... the rights and privileges herein (therein) granted." Hittell's Laws, sect. 4798; Acts of 1863-64, 471. Inasmuch as by the Constitution of California then in force (art. 4, sect. 31) corporations, except for municipal purposes, could not be created by special act, but must be formed under general laws, the legal effect of this act is probably little more than a legislative recognition by the State of what had been done by the United States with one of the State corporations.
In so doing, the State but carried out its original policy in reference to the same subject-matter, for as early as May 1, 1852, an act was passed reciting "that the interests of this State, as well as those of the whole Union, require the immediate action of the government of the United States, for the construction of a national thoroughfare connecting the navigable *729 waters of the Atlantic and Pacific Oceans, for the purposes of national safety, in the event of war, and to promote the highest commercial interests of the Republic," and granting the right of way through the State to the United States for the purpose of constructing such a road. Hittell's Laws, sect. 4791; Acts of 1852, 150. In 1859 (Acts of 1859, 391), a resolution was passed calling a convention "to consider the refusal of Congress to take efficient measures for the construction of a railroad from the Atlantic States to the Pacific, and to adopt measures whereby the building of said railroad can be accomplished;" and at the same session of the legislature a memorial was prepared asking Congress to pass a law authorizing the construction of such a road, and asking also a grant of lands to aid in the construction of railroads in the State. Acts of 1859, 395. Nothing was done, however, by Congress until the Rebellion, which at once called the attention of all who were interested in the preservation of the Union to the immense practical importance of such a road for military purposes, and then, as soon as a plan could be matured and the necessary forms of legislation gone through with, the act of July 1, 1862, was passed. But this was not enough to interest capitalists in the undertaking, and although the legislature of California during the year 1863 passed several acts intended to hold out further inducements, but little was accomplished until the amendatory act of Congress in 1864, which, besides authorizing the first mortgage, and changing in some important particulars the conditions on which the subsidy bonds were to be issued, conferred additional powers on the corporation, some of which, such as the right of eminent domain in the Territories, the State could not grant, and others, such as the right of issuing first-mortgage bonds without a sinking-fund, and in excess of the capital stock, it had seen fit to withhold. This act also reserved to Congress full power of amendment, and was promptly accepted by the corporation. With this addition of corporate powers and pecuniary resources the work was pushed forward to completion with unexampled energy. But for the corporate powers and financial aid granted by Congress it is not probable that the road would have been built. The first-mortgage bonded debt was created without a sinking-fund, and the road *730 in the Territories built under the authority of Congress, assented to and ratified by the State.
The Western Pacific Company, now, by consolidation, a part of the Central Pacific Company, was also organized, Dec. 13, 1862 (Acts of 1863, 81), under the general railroad law of California, with power to construct a road from a point on the San Francisco and San José Railroad, at or near San José, to Sacramento, and there connect with the road of the Central Pacific Company. Afterwards the Central Pacific Company assigned to this corporation its rights, under the act of Congress, to construct the road between San José and Sacramento; and this assignment was ratified by Congress, "with all the privileges and benefits of the several acts of Congress relating thereto, and subject to all the conditions thereof." 13 Stat. 504. By the same act further privileges were granted by the United States both to the Central Pacific and Western Pacific Companies, in respect to their issue of first-mortgage bonds.
Under this legislation, we are of the opinion that, to the extent of the powers, rights, privileges, and immunities granted these corporations by the United States, Congress retains the right of amendment, and that in this way it may regulate the administration of the affairs of the company in reference to the debts created under its own authority, in a manner not inconsistent with the requirements of the original State charter, as modified by the State Aid Act of 1864, accepting what had been done by Congress. This is as far as it is necessary to go now. It will be time enough to consider what more may be done when the necessity arises. As yet, the State has not attempted to interfere with the action of Congress. All complaint thus far has come from the corporation itself, which, to secure the government aid, accepted all the conditions that were attached to the grants, including the reservation of power to amend.
It is clear that the establishment of a sinking-fund by the act of 1878 is not at all in conflict with any thing contained in the original State charter, for by that charter no such debt could be created without provision for such a fund. This part of the act of 1878 is, therefore, in the exact line of the policy *731 of the State, and does no more than place the company again, to some extent, under obligations from which it had been released by congressional legislation. So, too, the reservation of the power of amendment by Congress is equally consistent with the settled policy of the State; for not only the State charter, in terms, makes such a reservation in favor of the State, but the Constitution expressly provides that all laws for the creation of corporation "may be altered from time to time, or repealed." Art. 4, sect. 31.
It is not necessary now to inquire whether, in ascertaining the net earnings of the company for the purpose of fixing the amount of the annual contributions to the sinking-fund, the earnings of all the roads owned by the present corporation are to be taken into the account, or only of those in aid of which the land-grants were made and the subsidy bonds issued. The question here is only as to the power of Congress to establish the fund at all. If disputes should ever arise as to the manner of stating the accounts, they can be settled at some future time.
Judgment affirmed.
Decree affirmed.
MR. JUSTICE FIELD, MR. JUSTICE STRONG, and MR. JUSTICE BRADLEY, dissented.
MR. JUSTICE STRONG. In my opinion, the act of Congress of May 7, 1878, is plainly transgressive of legislative power. As was said by Mr. Hamilton in his celebrated communication to the Senate of Jan. 20, 1795, "when a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate, unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with a power to make a law which can vary the effect of it." 3 Hamilton's Works, 518, 519. Opinions similar to this have often found expression in judicial decisions, even in those of this court. If this *732 be sound doctrine, it is as much beyond the power of a legislature, under any pretence, to alter a contract into which the government has entered with a private individual, as it is for any other party to a contract to change its terms without the consent of the person contracting with him. As to its contract the government in all its departments has laid aside its sovereignty, and it stands on the same footing with private contractors.
The contracts of the government with the Union Pacific Railroad Company and with the Central Pacific, which the act of Congress of 1878 has in view, were not made by the act of 1862, the act chartering the former company, nor by the amending act of 1864. They were made after those acts had been accepted by the companies, and after their chartered rights had been completely acquired. There was no agreement of the companies to repay the loan of government bonds made to them, until the bonds were issued and delivered. The companies were under no obligation to accept the loan and assume the liability resulting from its acceptance. The contracts, therefore, are no part of the charter of the Union Pacific Company, and no part of the acts of 1862 or 1864. They are subsequent to those acts and independent of them. It is true Congress authorized the loan. It made the companies offers to lend upon certain conditions; and when those offers and conditions were subsequently accepted, the contracts of loan were made. Not until then. Before that time there was nothing but an unaccepted offer.
What, then, was the contract when it was made? The government lent its bonds, and, in consideration of the loan, each company assumed five obligations: 1st, to pay the bonds at their maturity, that is, at the expiration of thirty years; 2d, to keep the railroad and telegraph line in repair and use; 3d, to furnish transmission of despatches and transportation for the government at reasonable rates, allowing it a preference for such purposes; 4th, to apply to the payment of the bonds and interest half the compensation due to it from the government for services rendered, until the whole amount of the loan is fully paid; and, 5th, after the completion of the railroad, to apply to the payment of the bonds at least five per cent annually *733 of its net earnings. The lender required and the borrower undertook nothing more.
It is manifest that by this contract the government acquired a vested right to payment at the time and in the mode specified, as well as to preference of transportation and transmission of despatches; and the company acquired a vested right to retain the consideration given for its assumption,  that is, a vested right to withhold payment until by the terms of the contract payment became due. The contract implied an agreement not to call for payment or additional security before that time. I cannot conceive of any rational doubt of this. There is no technicality about vested rights. Most of them grow out of contracts, and, no matter how they arise, they are all equally sacred, equally beyond the reach of legislative interference. A vested right of action is property in the same sense in which rights to tangible things are, and is equally protected. Whether it springs from contract or from other rules of the common law, it is not competent for the legislature to take it away. If we look at what must have been the understanding of all parties to these contracts of loan, the rights created and vested under them cannot be in doubt. The government sought to induce private adventurers to construct a railroad and telegraph line to the Pacific Ocean,  a work which necessarily required years and immense expenditures for its accomplishment. A loan, repayable on call or within a short time, would have been no inducement. Had it been dreamed that a call could have been made at any time thereafter designated by Congress, it is inconceivable that the loan proffered would have been accepted. It would have furnished no reliable basis for an attempt to build the road. The parties could not so have understood the bargain. The bonds were required to be paid by the companies only at their maturity, except so far as half-payment for governmental service, and five per cent of the net earnings, after the completion of the road, might pay. The contract, therefore, means exactly what it would have meant had it contained the express stipulation: "The United States shall not require payment of the amount of the bonds, or any part thereof (except half-compensation for services, and five per cent of net earnings), until the expiration of thirty years from *734 their issue to the company, or date, nor shall additional security be required, beyond the lien reserved." Such was the contract. It was not one of the franchises granted in the charter of the Union Pacific or the Central Pacific, but it was a business transaction, differing in nothing, except parties, from what it would have been if it had been made between two private individuals. It is true Congress authorized the loan on the terms upon which it was made; but, as I have said, the contract was not made by the act of Congress, or with Congress. It was a subsequent transaction, and the United States became a party to it, not in its sovereign character, but as a civil corporation, as said by Mr. Hamilton, with the same rights and obligations as a private person, and no more.
Now, what has been attempted by the act of May 7, 1878? That act was passed with sole reference to this contract, and all its provisions have in view the imposition of additional obligations upon the railroad company. It does not purport to be a repeal of the charter. Its leading purpose is to take control of the property of the debtor, and sequester it for the security of a debt, which, by the terms of the contract, is not due and payable for years to come. I shall not go over all its provisions. It will be sufficient to notice some of the more prominent ones, which, if they are ruled to be operative, greatly change the contract which the parties made when the bonds were delivered and accepted, when the contract was closed, and which impose new and oppressive obligations upon the debtor.
By the contract only one-half the compensation for services rendered to the government was required to be applied to the payment of the bonds, but by this act the whole amount of the compensation which may from time to time be due for services rendered to the government is directed to be retained by the United States, and, at the same time, the obligation to render those services is continued. By the third section of the act a sinking-fund is established in the treasury of the United States, that is, in the treasury of the creditor; and the fourth section enacts that there shall be carried into that fund, on the first day of February in each year, the one-half of the compensation above *735 named, not applied in liquidation of interest. By the contract the debtor was bound to pay only five per cent of its net earnings, after the completion of the road, annually to the creditor; but this act requires the debtor to pay into the creditor's treasury, to the credit of the sinking-fund, twenty-five per cent of its whole net earnings, on the 1st of February in each year. The act further directs that the sinking-fund thus created shall, with its accumulations, be invested in bonds of the United States, and at the maturity of the bonds loaned to the debtor be applied to the payment and satisfaction thereof, and of all interest paid by the United States. There are other provisions of this act intended to enforce compliance with these newly added obligations imposed upon the debtor, as also provisions that the sinking-fund shall be held for the benefit, protection, and security of other lien-creditors of the debtor. But I deem it unnecessary to mention them in detail. Those which I have mentioned are enough for the present case. No one can deny that they materially change the contract of loan and borrowing previously existing between the government and the railroad companies, and change it at the will of the creditor alone. Nor can it be denied that they impose upon the debtors new and onerous burdens that they never agreed to assume. Practically, they enforce payment of the debt before, by the terms of the contract, it is due. The act seizes the half-compensation, which the government agreed should not be retained, and covers it into the treasury, appropriating it to the payment of the debt. For nothing else can it be used. The act also requires payment into the treasury of twenty-five per cent of the net earnings of the company, instead of five per cent only, as stipulated when the contract was made. It is true it does not make immediate application of the sums thus withheld and demanded to the extinguishment of the debt. It declares that they shall be applied to the payment of the debt and interest "at the maturity of the bonds." But this is a distinction without a difference, obviously made to evade what it was known could not lawfully be done. An immediate application might as well have been directed. It would probably be better for the debtor if the application were immediately made. The money is taken from the debtor, withdrawn entirely from the *736 debtor's control and use, and put into the treasury of the creditor, and there left to the mere agreement of the creditor to apply it to payment. I apprehend no plain man of common sense will hesitate to conclude that this is exacting payment before the debt is due. If A borrows from B. $1,000, and gives his note therefore, payable at the expiration of five years, and at the end of one year the lender demands that there be placed in his hands by the debtor a sum of money to meet the note when it shall fall due, it will hardly be contended that would not be requiring payment before the debtor was bound to pay. And if such a demand could be enforced, it would be at the expense of the contract. What more is the present case? And were it conceded the act of 1878 does not attempt to enforce the payment before the maturity of the debt, the concession would be of little worth, for it will not be questioned that it attempts to enforce giving additional security for payment beyond that stipulated for in the contract. That is no less a material alteration of the contract, a serious addition to it. The plain truth is, the assertion of such a power is claiming the right to disregard the contract entirely, and substitute for it a different one, without the consent of the debtor. If the United States can exact now one-quarter of the net earnings of each of these companies, and place it in their treasury, they can, by the same power, and with the same reason, exact the whole of the earnings, or any other property equal to the amount of the debt. Was any such thing contemplated by the parties when the contract was made?
Now, where is the power of Congress to add new terms to any contract made with the United States, or made between any two private individuals? Where is the power to annul vested rights? It is certainly not to be found in the Constitution. True, the provision that no State shall pass any law impairing the obligation of contracts applies only to State legislation. For such legislation the prohibition was necessary; for State legislatures have all legislative power which is not expressly denied to them. But no necessity existed for imposing such a limitation on the power of Congress. As Mr. Hamilton said in the eighty-fourth number of the Federalist, "Why declare that things shall not be done which there is no power to *737 do?" Congress has no power except such as has been expressly granted to it, or such as is necessary or proper for carrying into execution the powers specified, and those vested by the Constitution in the government, or some department or officer thereof. I search in vain for any express or implied grant of power to add new terms to any existing contracts made by or with the government, or any grant of power to destroy vested rights. No power has been given to Congress to lessen the obligations of a contract between private parties by direct legislation, except by the enactment of uniform laws on the subject of bankruptcy. Even a bankrupt law cannot be enacted applicable only to single corporations or single debtors. To be constitutional, it must be uniform throughout the United States. I admit that in the exercise of some of the powers granted, Congress may enact laws that indirectly affect existing contracts and lessen their obligation, but I deny that it can by any direct action, otherwise than by a bankrupt law, even relieve a debtor to a private party from any duty he has assumed by his contract. Much less can it change the stipulations of the contract and impose additional liabilities upon a contractor with the government. Such an exercise of power would be making a contract for parties to which they never assented. In all the history of congressional legislation before the act of 1878, such a power was never attempted to be exercised.
And not only is such legislative authority not conferred upon Congress by the Constitution, but it is, in effect, expressly denied. The fifth amendment contains restrictions taken, in substance, from Magna Charta. Among them are the provisions that no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation. These are restrictions upon legislative as well as executive power. What is due process of law is well understood. It is law in regular course of administration through courts of justice. Coke, 2 Inst. 272; Murray's Lessee v. The Hoboken Land and Improvement Co., 18 How. 272. "The terms `the law of the land,' said Chief Justice Ruffin (Hoke v. Harderson, 4 Dev. (N.C.) 1), do not mean merely an act of the General Assembly. If they *738 did, every restriction upon legislative authority would be at once abrogated, and private property would be at the mercy of the legislature." p. 15. Yet the act of 1878 does attempt by its own force, and without any judicial action, not only to change a contract and increase its obligations, but also to deprive the railroad companies of their property. What is property? What is the common understanding of the term? It is, in reference to its subject, whatever a person can possess and enjoy by right, and the person who has that right has the property. The subject may be corporeal or incorporeal. A right in action is as completely property as is a title to land. A very large portion of the property of the country consists in rights attendant upon contract. The right of a promisee to demand payment when the note falls due is a right of property; and equally so is the right of the promisor to hold, as against his promisee, the consideration for the promise until the time stipulated in the note for payment. The promisee has no right to enforce payment, or to enforce giving security for it, if none was promised in the contract. Such a right is no portion of his property, and it can be enforced only at the expense of a clear right of the promisor. On the other hand, the promisor has a right to exemption from liability to give such security. It is incident to his contract. Indeed, it may be said that whatever rights are created by contract, or held under it, if they relate to property, are themselves, in a very just sense, property, and as such are protected by the fifth amendment to the Constitution.
I notice another consideration which, to my mind, is not without weight. It may, I think, well be doubted whether the act of 1878 is even an attempted exercise of legislative power. A statute undertaking to take the property of A. and transfer it to B. is not legislation. It would not be a law. It would be a decree or sentence, the right to declare which, if it exists at all, is in the Judicial Department of the government. The act of Congress is little, if any, more. It does not purport to be a general law. It does not apply to all corporations or to all debtors of the government. It singles out two corporations, debtors of the government, by name, and prescribes for them as debtors new duties to their creditor. It thus attempts *739 to perform the functions of a court. This, I cannot but think, is outside of legislative action and power.
I turn now to the arguments by which the constitutionality of the act of Congress has been attempted to be supported. It is said that, though Congress cannot directly abrogate contracts, or impair their obligation, it may indirectly, by the exercise of other powers granted to it. This I have conceded, but I deny that an acknowledged power can be exerted solely for the purpose of effecting indirectly an unconstitutional end which the legislature cannot directly attempt to reach. If the purpose were declared in the act, I think no court would hesitate to pronounce the act void. In Hoke v. Harderson, to which I have referred, Chief Justice Ruffin, when considering at length an argument that a legislature could purposely do indirectly what it could not do directly, used this strong language: "The argument is unsound in this, that it supposes (what cannot be admitted as a supposition) the legislature will, designedly and wilfully, violate the Constitution, in utter disregard of their oaths and duty. To do indirectly in the abused exercise of an acknowledged power, not given for, but perverted for that purpose, that which is expressly forbidden to be done directly, is a gross and wicked infraction of the Constitution."
It is unnecessary, however, to enlarge upon this, for the effect wrought upon the contracts of these two companies is a direct effect,  a direct alteration of the obligation assumed by the debtors, and not an incidental result of legislation upon some other subject over which Congress has a right to legislate. It is too plain to admit of any doubt that the sole object of the act of 1878 was to enforce giving new and additional security for the payment of the subsidy bonds at their maturity. All its provisions aim directly at that, and the new terms thereby added to the contract have that end solely in view.
In further attempted support of the validity of the act, it has been denied that it does change the contract, because it does not require the application of the additional payments to the satisfaction of the debt before its maturity. I have, perhaps, said enough upon this subject. The argument can hardly be seriously made. The act does compel the debtors to surrender *740 possession of their property to the creditor before the time when, by the terms of the contract, they were under obligation to part with it. The debtors are no longer permitted to hold and use one-half the compensation due presently from the government for services rendered, and are no longer at liberty to use all their net income or earnings, except five per cent, at their discretion. One quarter of their net earnings they are compelled to surrender to the creditor. Thus the creditor becomes the custodian of the debtors' property, and acquires a right to hold and manage it as if it were his own. It is absurd to say this is not practically a radical change in the relations between the parties established by the contract. And it is equally impossible to maintain that it is not depriving the debtors of their property without due process of law.
I turn now to what has been most relied upon in support of the validity of the act. I refer to the clauses in the acts of 1862 and 1864, reserving the right to repeal, amend, or alter. There are two such,  one in the act of 1862, and one in that of 1864. That in the latter act is the broadest, and it is as follows: "Congress may at any time alter, amend, or repeal this act." The power thus reserved is one over the act itself, not over any thing that may have lawfully been done under the act, before its repeal or alteration. It is only by great confusion of things essentially distinct that this power can be construed as applicable to a contract made after the corporation came into existence. Besides, the act of 1878 does not attempt to repeal, or alter or amend, the acts of 1862 and 1864. It changes no franchise granted by those acts, nor does it interfere with its exercise. It interferes only with the fruits of the franchise. The right to possess and enjoy the income of the company is not a franchise. It is an incident of the ownership of the company's property, though the property may be accumulated by the use of the franchise. Concede that Congress has power to regulate the tolls on the railroad, or in some other mode to restrict the use of the franchise, and thus lessen the income, yet the income, whether large or small when made, is the company's property, and, like other property, protected against being taken without due process of law. Or suppose the acts of 1862 and 1864 were repealed, and thus all the franchises *741 granted by them were taken away, the property of the company would remain, and the income thereof, though greatly decreased, would be the property of the stockholders. Nobody denies that. Is the lesser greater than the whole? I repeat, therefore, the act of 1878 is no exercise of the reserved power to alter, amend, or repeal the acts of 1862 and 1864. It is no attempt to make any such repeal or amendment. It is at most an attempt to seize the fruits of the franchise after they shall have become the vested property of the corporations. It is an attempt to sequester the income of the property owned by them. As well might the government attempt to seize and put into its treasury the rents, issues, and profits of the lands granted to them by the third and fourth sections of the act of 1862, and call that an amendment of the act. There is no distinction to be made between the profits of the road and telegraph line and the rents of the lands. None has been attempted.
But if the act of 1878 could be considered an alteration or amendment of the acts of 1862 and 1864, the question would still remain, what was the extent of the power reserved by those acts. I mean the power to alter, amend, or repeal them. All the cases agree that such a reserved power is not without limits. I think its limits may be stated generally thus: It must be exercised, when exerted at all, so as to do no injustice to those to whom the franchise has been granted. Certainly the reservation cannot mean a right to take away the franchise, in whole or in part, and yet hold the grantee to the performance of the duties assumed,  the consideration given for the grant. Nor can it mean to continue in the legislative power which the legislature never possessed, and which it is constitutionally incapable of exercising. A partial definition of the limits of the reserved power may be found in Commonwealth v. Essex Company (13 Gray (Mass.), 239), where Chief Justice Shaw (speaking of the reserved power to alter, amend, or repeal a charter), said: "It seems to us this power must have some limit, though it is difficult to define it. Suppose authority has been given by law to a railroad corporation to purchase a lot of land and hold it for purposes connected with its business, and they purchase such lot from a third person, could the legislature *742 prohibit the company from holding it? If so, in whom would it vest? Or could the legislature direct it to revert to the grantor or escheat to the public? Or how otherwise? Suppose a manufacturing company, incorporated, is authorized to construct a dam and flow a tract of meadow, and the owners claim gross damages, which are assessed and paid, can the legislature afterwards alter the act of incorporation so as to give to such meadow owners future annual damages? Perhaps from these extreme cases, for extreme cases are allowable to test a legal principle, the rule to be extracted is this: that where, under a power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted." p. 253. This rule has been recognized ever since. Vide Sage v. Dillard, 15 B. Mon. (Ky.) 349. It has been adopted by this court. In Miller v. The State (15 Wall. 478), it was said by Mr. Justice Clifford: "Power to legislate founded upon such a reservation in a charter of a private corporation is certainly not without limits, and it may well be admitted that it cannot be exercised to take away or destroy rights acquired by such a charter, and which, by a legitimate use of the powers granted, have become vested in the corporation." To the same effect is Holyoke Company v. Lyman, id. 500. If this limitation be admitted, it is impossible to see how a reserved power to alter, amend, or repeal an act granting a private charter can include a right to change the stipulations of a contract made under that charter, or to sequester for any purpose the property of the company acquired while the charter remains unrepealed and unaltered. If the acts of 1862 and 1864 were repealed, would not the contract of loan remain unaffected thereby? Can a legislature that offers a contract on certain terms change those terms after they have been accepted and after the contract has been perfected? Yet that is what the act of 1878 attempts to do. A principal who has authorized his agent to make a contract for him may revoke or restrict the agency before any contract is made, but he is bound by a contract made during the continuance of the agent's powers, if those powers were not transgressed in making it. He cannot afterwards repudiate its *743 terms or add to them. I see no essential difference between such a case and the present. I cannot confound an alteration of the acts of 1862 and 1864 with an alteration of a subsequent commercial contract authorized by those acts, and made between the United States and companies chartered by them. My conviction, therefore, is, that the act of 1878 cannot be defended as a legitimate exercise of the powers reserved to Congress.
I need not say it cannot rest upon what is generally denominated the visitatorial power of the government over its own corporations, though it is upon this power the opinion of the majority of the court largely relies. That power is applicable only to eleemosynary corporations, such as colleges, schools, and hospitals, and the visitation is always through the medium of courts of justice. It is judicial and not legislative. 2 Kent, Com., Lect. 23, sect. 4. To claim, therefore, that, by virtue of that power, a private business corporation can be compelled by legislative action to establish a sinking-fund for the payment of its debts, and deposit it in the treasury of its creditor, is totally inadmissible.
There are, undoubtedly, many cases to be found in which it has been decided that, by virtue of such a reservation as that contained in the acts of 1862 and 1864, a legislature may make new regulations, to some extent, of the action of corporations created by it,  such as prescribing a new measure of tolls, increasing the capital of insurance companies, repealing an exemption from taxation, and the like. So, without the reservations, some new regulations may be prescribed in the exercise of the police power. They are all regulations of the franchise or of its use,  not invasions of rights or property acquired under the franchise subsequently to its grant; and not one of them under the practice of amendment or rightful regulation has undertaken to change or vary any contract the corporation had made, or to control possession of property acquired. The act of 1878 is, I believe, the first assertion of any such force in the reservation. It is a very grave and dangerous assertion. It is especially dangerous in these days of attempted repudiation, when the good faith of the government is above all price. If it can be maintained, the government is no longer bound by *744 any commercial contract into which it may enter with these corporations, though it holds them bound. I cannot assent to any such doctrine; and upon the whole, in my opinion, the act of 1878 is not only unauthorized by any power existing in Congress, but it is an infraction of the prohibition I have pointed out, contained in the fifth amendment of the Constitution.
Most of what I have said is applicable to each of the cases,  that of the Union Pacific and that of the Central. There are some other considerations peculiar in the case of the Central Pacific, which is a corporation of the State of California, and was such in 1862. These I leave for consideration by my brethren who unite with me in dissent.
MR. JUSTICE BRADLEY.
I am unable to concur in the judgment of the court in these cases, and will very briefly state the grounds of my dissent.
I think that Congress had no power to pass the act of May 7, 1878, either as it regards the Union Pacific or the Central Pacific Railroad Company. The power of Congress, even over those subjects upon which it has the right to legislate, is not despotic, but is subject to certain constitutional limitations. One of these is, that no person shall be deprived of life, liberty, or property without due process of law; another is, that private property shall not be taken for public use without just compensation; and a third is, that the judicial power of the United States is vested in the supreme and inferior courts, and not in Congress. It seems to me that the law in question is violative of all these restrictions,  of their spirit at least, if not of their letter; and a law which violates the spirit of the Constitution is as much unconstitutional as one that violates its letter. For example, although the Constitution declares only that private property shall not be taken for public use without just compensation, and does not expressly declare that it shall not be taken for private use without compensation, or, in other words, does not declare that the property of one person shall not be taken from him and given to another without compensation, yet no one can reasonably doubt that a law which should do this would be unconstitutional, because the prohibition to do *745 it is within the spirit of the prohibition that is given, it being the greater enormity of the two.
The contract between the Union and Central Pacific Railroad Companies and the government was an executed contract, and a definite one. It was in effect this: that the government should loan the companies certain moneys, and that the companies should have a certain period of time to repay the amount, the loan resting on the security of the companies' works. Congress, by the law in question, without any change of circumstances, and against the protest of the companies, declares that the money shall be paid at an earlier day, and that the contract shall be changed pro tanto. This is the substance and effect of the law. Calling the money paid a sinking-fund makes no substantial difference. The pretence or excuse for the law is that the stipulated security is not good. Congress takes up the question, ex parte, discusses and decides it, passes judgment, and proposes to issue execution, and to subject the companies to heavy penalties if they do not comply. That is the plain English of the law. In view of the limitations referred to, has Congress the power to do this? In my judgment it has not. The law virtually deprives the companies of their property without due process of law; takes it for public use without compensation; and operates as an exercise by Congress of the judicial power of the government.
That it is a plain and flat violation of the contract there can be no reasonable doubt. But it is said that Congress is not subject to any inhibition against passing laws impairing the validity of contracts. This is true; and the reason why the inhibition to that effect was imposed upon the States and not upon Congress evidently was, that the power to pass bankrupt laws should be exclusively vested in Congress, in order that the bankruptcy system might be uniform throughout the United States. When the States exercised the power, they often did it in such a manner as to favor their own citizens at the expense of the citizens of other States and of foreign countries. It was deemed expedient, therefore, to take the power from the States so far as it might involve the impairing the validity of contracts. State bankrupt laws, since the Constitution went into effect, have only been sustained when operating prospectively *746 upon contracts, and then only in the absence of a national law. The inhibition referred to undoubtedly had its origin in these considerations. It fully explains the fact that no such inhibition was laid upon the national legislature; and the absence of such an inhibition, therefore, furnishes no ground of argument in favor of the proposition that Congress may pass arbitrary and despotic laws with regard to contracts any more than with regard to any other subject-matter of legislation. The limitations already quoted exist in their full force, and apply to that subject as well as to all others. They embody the essential principles of Magna Charta, and are especially binding upon the legislative department of the government. Under the English Constitution, notwithstanding the theoretical omnipotence of Parliament, such a law as the one in question would not be tolerated for a moment. The famous denunciation that "it would cut every Englishman to the bone," would be promptly reiterated.
It will not do to say that the violation of the contract by the law in question is not a taking of property. In the first place, it is literally a taking of property. It compels the companies to pay over to the government, or its agents, money to which the government is not entitled. That it will be entitled by the contract to a like amount at some future time does not matter. Time is a part of the contract. To coerce a delivery of the money is to coerce without right a delivery of that which is not the property of the government, but the property of the companies. It is needless to refer to the importance to the companies of the time which the contract gives. If it be alleged that the security of the government requires this to be done in consequence of waste or dissipation by the companies of the mortgage security, that is a question to be decided by judicial investigation with opportunity of defence. A prejudgment of the question by the Legislative Department is a usurpation of the judicial power.
But if it were not, as it is, an actual or physical taking of property,  if it were merely the subversion of the contract and the substitution of another contract in its place, it would be a taking of property within the spirit of the constitutional provisions. A contract is property. To destroy it wholly or *747 to destroy it partially is to take it; and to do this by arbitrary legislative action is to do it without due process of law.
The case bears no analogy to the laws which were passed in time of war and public necessity, making treasury notes of the government a legal tender. The power to pass those laws was found in other parts of the Constitution: in the power to borrow money on the credit of the United States, to regulate the value of money, to raise and support armies, to suppress insurrections, and to pass all laws necessary and proper for carrying into execution the general powers of the government. My views on that subject were fully expressed in the Legal-Tender Cases, reported in 11 Wallace, and I have yet seen no reason to modify them. The legal-tender laws may have indirectly affected contracts, but did not abrogate them. The case before us is totally different. It is a direct abrogation of a contract, and that, too, of a contract of the government itself,  a repudiation of its own contract.
Nor does the case in hand bear any analogy to what are familiarly known as the Granger Cases, reported in 94 U.S. under the names of Munn v. Illinois, &c. The inquiry there was as to the extent of the police power in cases where the public interest is affected; and we held that when an employment or business becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power. It is obvious that the present case does not belong to that category. It is an individual case of private contract between the companies and the government. It is a question of dollars and cents, and terms and conditions, in a particular case. To call the law an exercise of the police power would be a misuse of terms.
Great stress, however, is laid upon the reservation in the charter of the right to amend, alter, or repeal the act.
As a matter of fact, the reservation referred to really has no office in an act of Congress; for Congress is not subject, as the States are, to the inhibition against passing any law impairing the obligation of contracts. It has become so much the custom *748 to insert it in all charters at the present day, that its original intent and purpose are sometimes forgotten. Since, however, it is contained in the charter of the Union Pacific Railroad Company, it is proper that its meaning and effect should be adverted to.
It seems to me that this clause has been greatly misunderstood. It is a sort of proviso peculiar to American legislation, growing out of the decision in the Dartmouth College Case. Mr. Justice Story, in his opinion in that case (4 Wheat. 675), says: "When a private eleemosynary corporation is thus created by the charter of the crown, it is subject to no other control on the part of the crown than what is expressly or impliedly reserved by the charter itself. Unless a power be reserved for this purpose, the crown cannot in virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or divest the corporation of any of its franchises." This hint, that such a reservation would authorize an alteration or amendment to be made in a charter, has been freely availed of by legislatures and constitutional conventions in order to be freed from the constitutional restriction against impairing the validity of contracts, so far as it applied to charters of incorporation. The application of that restriction to such charters, by construing them to be contracts within the meaning of the Constitution, was a surprise to many statesmen and jurists of the country. Chief Justice Marshall, indeed, in his opinion in that case, says: "It is more than possible that the preservation of rights of this description was not particularly in the view of the framers of the Constitution, when the clause under consideration was introduced into the instrument." p. 644. Probably in view of this somewhat unexpected application of the clause, operating as it did to deprive the States of nearly all legislative control over corporations of their own creation, the courts have given liberal construction to the reservation of power to alter, amend, and repeal a charter; and have sustained some acts of legislation made under such a reservation which are at least questionable.
In my judgment, the reservation is to be interpreted as placing the State legislature back on the same platform of power and control over the charter containing it as it would have *749 occupied had the constitutional restriction about contracts never existed; and I think the reservation effects nothing more. It certainly cannot be interpreted as reserving a right to violate a contract at will. No legislature ever reserved such a right in any contract. Legislatures often reserve the right to terminate a continuous contract at will; but never to violate a contract, or change its terms without the consent of the other party. The reserved power in question is simply that of legislation,  to alter, amend, or repeal a charter. This is very different from the power to violate, or to alter the terms of a contract at will. A reservation of power to violate a contract, or alter it, or impair its obligation, would be repugnant to the contract itself, and void. A proviso repugnant to the granting part of a deed, or to the enacting part of a statute, is void. Interpreted as a reservation of the right to legislate, the reserved power is sustainable on sound principles; but interpreted as the reservation of a right to violate an executed contract, it is not sustainable.
The question then comes back to the extent of the power to legislate. But that is a restricted power,  restricted by other constitutional provisions, to which reference has already been made. Certainly the legislature cannot in a charter of incorporation, or in any other law, reserve to itself any greater power of legislation than the Constitution itself concedes to it. It seems to me clear, therefore, that the power reserved cannot authorize a flat abrogation of the contract by Congress, because, as before shown, such an abrogation would be a violation of those clauses which inhibit the taking of property without process of law and without compensation.
It may be said that by reason of the reserved power to alter and repeal a charter, this court has sustained legislative acts imposing taxes from which the corporation by the charter was exempted. This is true. But the imposition of taxes is preeminently an act of legislation. Its temporary suspension, conceded in a charter, is a suspension of the legislative power pro tanto. Being such, a reservation of the right to legislate, or, which is the same thing, to alter, amend, or repeal the charter, necessarily includes the right to resume the power of taxation. The same observations apply to the regulation of fares and freights; for this is a branch of the police power, applicable *750 to all cases which involve a common charge upon the people.
I conclude, therefore, that the power reserved to alter, amend, and repeal the charter of the Union Pacific Railroad Company is not sufficient to authorize the passage of the law in question.
I will only add, further, that the initiation of this species of legislation by Congress is well calculated to excite alarm. It has the effect of announcing to the world, and giving it to be understood, that this government does not consider itself bound by its engagements. It sets the example of repudiation of government obligations. It strikes a blow at the public credit. It asserts the principle that might makes right. It saps the foundations of public morality. Perhaps, however, these are considerations more properly to be addressed to the legislative discretion. But when forced upon the attention by what, in my judgment, is an unconstitutional exercise of legislative power, they have a more than ordinary weight and significance.
MR. JUSTICE FIELD. I also dissent from the judgment of the court in these cases.
The decision will, in my opinion, tend to create insecurity in the title to corporate property in the country. It, in effect, determines that the general government, in its dealings with the Pacific Railroad Companies, is under no legal obligation to fulfil its contracts, and that whether it shall do so is a question of policy and not of duty. It also seems to me to recognize the right of the government to appropriate by legislative decree the earnings of those companies, without judicial inquiry and determination as to its claim to such earnings, thus sanctioning the exercise of judicial functions in its own cases. And in respect to the Central Pacific Company it asserts a supremacy of the Federal over the State government in the control of the corporation which, in my judgment, is subversive of the rights of the State. I therefore am constrained to add some suggestions to those presented by my associates, Justices Strong and Bradley. In what I have to say I shall confine myself chiefly to the case of the Central Pacific Company. That company is a State corporation, and is the successor of a corporation of the same name, created before the railroad acts of Congress were passed, *751 and of four other corporations organized under the laws of the State. No sovereign attributes possessed by the general government were exercised in calling into existence the original company, or any of the companies with which it is now consolidated. They all derived their powers and capacities from the State, and held them at its will.
The relation of the general government to the Pacific companies is twofold: that of sovereign in its own territory and that of contractor. As sovereign, its power extends to the enforcement of such acts and regulations by the companies as will insure, in the management of their roads, and conduct of their officers in its territory, the safety, convenience, and comfort of the public. It can exercise such control in its territory over all common carriers of passengers and property. As a contractor it is bound by its engagements equally with a private individual; it cannot be relieved from them by any assertion of its sovereign authority.
Its relation to the original Central Pacific Company, and to the present company as its successor, in the construction and equipment of its road, and its use for public purposes, was and is that of a contractor; and the rights and obligations of both are to be measured, as in the case of similar relations between other parties, by the terms and conditions of the contract.
By the first section of the original railroad act of Congress, passed in July, 1862, certain persons therein designated were created a corporation by the name of the Union Pacific Railroad Company, and authorized to construct and operate a continuous railroad and telegraph line from a designated point on the one hundredth meridian of longitude west from Greenwich to the western boundary of Nevada Territory, and were invested with the powers, privileges, and immunities necessary for that purpose, and with such as are usually conferred upon corporations.
By subsequent provisions of the act and the amendatory act of 1864, three grants were made to the company thus created: a grant of a right of way over the public lands of the United States for the road and telegraph line; a grant of ten alternate sections of land on each side of the road, to aid in its construction and that of the telegraph line; and a grant of a certain *752 number of subsidy bonds of the United States, each in the sum of $1,000 payable in thirty years, with semi-annual interest,  patents for the lands and the bonds to be issued as each twenty consecutive miles of the road and telegraph should be completed. These grants were made upon certain conditions as to the completion of the road and telegraph line, their construction and use by the government, and their pledge as security for the ultimate payment of the bonds. They were the considerations offered by the government to the company for the work which it undertook.
By the act which thus incorporated the Union Pacific Company, and made the grants mentioned, the United States proposed to the Central Pacific that it should construct in like manner a railroad and a telegraph line through the State of California from a point near the Pacific coast to its eastern boundary, upon the same terms and conditions, and after completing them across the State, to continue their construction through the Territories of the United States until they should meet and connect with the road and telegraph line of the Union Pacific.
They, in effect, said to the company, that if it would construct a railroad and a telegraph line from the Pacific Ocean eastward to a connection with the Union Pacific,  the road to be in all respects one of first class,  and keep them in repair, so that they could be used at all times by any department of the government for the transmission of despatches and the transportation of mails, troops, munitions of war, supplies, and public stores, at reasonable rates of compensation, not exceeding such as were charged private persons for similar services, and allow the government at all times the preference in the use of the road and telegraph,  they would grant the company a right of way over the public lands for the construction of the road and telegraph line, and grant to it ten alternate sections of land on each side of the road, and give it their bonds, each for the sum of $1,000, payable thirty years after date, with semi-annual interest, such bonds to be issued at the rate of sixteen, thirty-two, or forty-eight the mile, according to the character of the country over which the road should be constructed; and would issue patents for the lands, and the subsidy bonds, as *753 each twenty consecutive miles of the road and telegraph should be completed in the manner prescribed; it being agreed that the company should pay the bonds as they should mature, and that for the security of their payment they should constitute a second mortgage upon the whole line of the road and telegraph, and that one-half of the compensation earned for services to the government, and, after the completion of the road, five per cent of its net earnings should be retained and applied to the payment of the bonds; and also, that the company should complete the road by the 1st of July, 1876, and keep it in repair and use thereafter, or upon failure to do so, that the government might take possession of the road and complete it, or keep it in repair and use as the case might be. And they further, in effect, said that if these terms and conditions were satisfactory, the company should file its written acceptance thereof with the Secretary of the Interior, within six months thereafter; and that thereupon there should be a contract between them.
This proposition of the government the Central Pacific accepted, and filed its acceptance as required; and thereupon the provisions of the act became a contract between it and the United States, as complete and perfect as could be made by the most formal instrument. The United States thus came under obligation to the company to make the grants and issue the bonds stipulated, upon the construction of the road and telegraph line in the manner prescribed. The corporate capacity of the company in no respect affected the nature of the contract, or made it in any particular different from what it would have been had a natural person been one of the parties. The company was not a creature of the United States, and Congress could neither add to nor subtract from its corporate powers. The exercise of the right of eminent domain allowed in the Territories was not the exercise of a corporate power. That right belongs to the sovereign authority, and whoever exercises it does so as the agent of that sovereignty. Nor was its character as a State institution changed by the fact that it was permitted by Congress to extend its road through the territory of the United States. This permission was no more than the license which is usually extended by positive agreement, or by comity in the absence of such agreement, by one State to the corporations of *754 another State, to do business and own property in its jurisdiction. Such license is not the source of the corporate powers exercised. Insurance companies, express companies, and, indeed, companies organized for almost every kind of business, are, by comity, permitted throughout the United States, and generally throughout the civilized world, to do business, make contracts, and exercise their corporate powers in a jurisdiction where, in a strict legal sense, they have no corporate existence. The Pacific Mail Steamship Company, for example, to take an illustration mentioned by counsel, is a corporation created under the laws of the State of New York, and, like the Central Pacific, has been subsidized by the United States. Its ships visit Central America, California, Japan, and China, and in all these places it leases or owns wharves, and makes and enforces contracts necessary to the transaction of its business, yet no one has ever pretended or suggested that it derived any of its corporate powers from the United States, or from the authorities of any of the places named. By consent of those authorities, expressed in terms, or implied in what is understood as their comity, it exercises powers derived solely from the State of New York.
When, therefore, Congress assented to the extension into the territory of the United States of the road which the Central Pacific was authorized by its charter to construct in California, it was deemed important for the company to obtain also the consent and authority of the State to act without its limits and assume responsibilities not originally contemplated. Accordingly, in 1864, the legislature of the State, at its second session after the adoption of the original railroad act of Congress, in order to enable the company to comply with its provisions and conditions, authorized the company to construct, maintain, and operate the road in the territory lying east of the State, and invested it with the rights, privileges, and powers granted by the act of Congress, with the reservation, however, that the company should be subject to all the laws of the State concerning railroad and telegraph lines, except that messages and property of the United States, of the State, and of the company should have priority of transmission and transportation. The extent of the power which was thus reserved we *755 shall hereafter consider. It is sufficient at present to observe that it was as ample and complete as it is possible for one sovereignty to exert over institutions of its own creation, and that its exercise is incompatible with the control asserted by the law of Congress of 1878, which has given rise to the present suit.
The Central Pacific Company having accepted, as already stated, the conditions proffered by Congress, proceeded at once to the execution of its contract. In the face of great obstacles, doubts, and uncertainties, its directors commenced and prosecuted the work, and within a period several years less than that prescribed, its telegraph line and road were completed, the latter with all the appurtenances of a first-class road, and were accepted by the government. Patents for the land granted and the subsidy bonds mentioned were accordingly issued to the company. Since then the road and telegraph line have been kept in repair and use, and the government has enjoyed all the privileges in the transmission of despatches over the telegraph, and in the transportation of mails, troops, munitions of war, supplies, and public stores over the road, which were stipulated. There has been no failure on the part of the company to comply with its engagements, nor is any complaint of delinquency or neglect in its action made by the government. The road is more valuable now than on the day of its completion; it has been improved in its rails, bridges, cars, depots, turnouts, machine-shops, and all other appurtenances. Its earnings have been constantly increasing, and it constitutes to-day a far better security to the United States for the ultimate payment of the subsidy bonds than at any period since its completion, and to the government it has caused, with the connecting road of the Union Pacific, an immense saving of expense. The records of the different departments show an annual saving, as compared with previous expenditures, in the item of transportation alone of the mails, troops, and public stores, of $5,000,000, aggregating at this day over $50,000,000.
Whilst the company was thus complying in all respects with its engagements, the act of May 7, 1878, was passed, altering in essential particulars the contract of the company, and greatly increasing its obligations. By the contract, only one-half of the compensation for transportation for the government is to *756 be retained and applied towards the payment of the bonds. By the act of 1878, the whole of such compensation is to be retained and thus applied. By the contract, five per cent only of the net earnings of the road are to be paid to the United States to be applied upon the subsidy bonds. By the act of 1878, twenty-five per cent of the net earnings are to be thus paid and applied. By the contract, the only security which the government had for its subsidy bonds was a second mortgage on the road and its appurtenances and telegraph line; and the company was allowed to give a first mortgage as security for its own bonds, issued for an equal amount. By the act of 1878, additional security is required for the ultimate payment of its own bonds, and the subsidy bonds of the United States, by the creation of what is termed a sinking-fund; that is, by compelling the company to deposit $1,200,000 a year in the treasury of the United States, to be held for such payment, or so much thereof as may be necessary to make the five per cent net earnings, the whole sum earned as compensation for services, and sufficient in addition to make the whole reach twenty-five per cent of the net earnings.
It is not material, in the view I take of the subject, whether the deposit of this large sum in the treasury of the creditor be termed a payment, or something else. It is the exaction from the company of money for which the original contract did not stipulate, which constitutes the objectionable feature of the act of 1878. The act thus makes a great change in the liabilities of the company. Its purpose, however, disguised, is to coerce the payment of money years in advance of the time prescribed by the contract. That such legislation is beyond the power of Congress I cannot entertain a doubt. The clauses of the original acts reserving a right to Congress to alter or amend them do not, in my judgment, justify the legislation. The power reserved under these clauses is declared to be for a specific purpose. The language in the act of 1862 is as follows: "And the better to accomplish the object of this act, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same *757 for postal, military, and other purposes, Congress may at any time  having due regard for the rights of said companies named herein  add to, alter, amend, or repeal this act." Sect. 18. The language of the amendatory act of 1864 is more general: "That Congress may at any time alter, amend, or repeal this act." The two acts are to be read together; they deal with the same subject; and are to be treated as if passed at the same time. Prescott v. Railroad Company, 16 Wall. 603. The limitations, therefore, imposed upon the exercise of the power of alteration and amendment in the act of 1862 must be held to apply to the power reserved in the act of 1864. They are not repealed, either expressly or impliedly, by any thing in the latter act. If this be so, the legislation of 1878 can find no support in the clauses. The conditions upon which the reserved power could be exercised under them did not then exist. The road and telegraph had years before been constructed, and always kept in working order; and the government has at all times been secured in their use and benefits for postal, military, and other purposes.
But if the reserved power of alteration and amendment be considered as freed from the limitations designated, it cannot be exerted to affect the contract so far as it has been executed, or the rights vested under it. When the road was completed in the manner prescribed and accepted, the company became entitled as of right to the land and subsidy bonds stipulated. The title to the land was perfect on the issue of the patents; the title to the bonds vested on their delivery. Any alteration of the acts under the reservation clauses, or their repeal, could not revoke the title to the land or recall the bonds or change the right of the company to either. So far as these are concerned the contract was, long before the act of 1878, an executed and closed transaction, and they were as much beyond the reach of the government as any other property vested in private proprietorship. The right to hold the subsidy bonds for the period at which they are to run without paying or advancing money on them before their maturity, except as originally provided, or furnishing other security than that originally stipulated, was, on their delivery, as perfect as the right to hold the title to the land patented unincumbered by *758 future liens of the government. Any alteration or amendment could only operate for the future and affect subsequent acts of the company: it could have no operation upon that which had already been done and vested.
There have been much discussion and great difference of opinion on many points as to the meaning and effect of a similar reservation in statutes of the States, but on the point that it does not authorize any interference with vested rights all the authorities concur. Such was the language of Chief Justice Shaw in the case cited from the Supreme Court of Massachusetts; and such is the language of Mr. Justice Clifford in the cases cited from this court. And such must be the case, or there would be no safety in dealing with the government where such a clause is inserted in its legislation. It could undo at pleasure every thing done under its authority, and despoil of their property those who had trusted to its faith. Commonwealth v. Essex Company, 13 Gray (Mass.), 239; Miller v. The State, 15 Wall. 478; Holyoke Company v. Lyman, id. 500. See also Shields v. Ohio, 95 U.S. 319, and Sage v. Dillard, 15 B. Mon. (Ky.) 349.
The object of a reservation of this kind in acts of incorporation is to insure to the government control over corporate franchises, rights, and privileges which, in its sovereign or legislative capacity, it may call into existence, not to interfere with contracts which the corporation created by it may make. Such is the purport of our language in Tomlinson v. Jessup, where we state the object of the reservation to be "to prevent a grant of corporate rights and privileges in a form which will preclude legislative interference with their exercise, if the public interest should at any time require such interference," and that "the reservation affects the entire relation between the State and corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the State." 15 Wall. 454. The same thing we repeated, with greater distinctness, in Railroad Company v. Maine, where we said that by the reservation the State retained the power to alter the act incorporating the company, in all particulars constituting the grant to it of corporate rights, privileges, and immunities; and that "the existence of the corporation, *759 and its franchises and immunities, derived directly from the State, were thus kept under its control." But we added, that "rights and interests acquired by the company, not constituting a part of the contract of incorporation, stand upon a different footing." 96 U.S. 499.
Now, there was no grant by the United States to the Central Pacific Company of corporate rights, privileges, and immunities. No attribute of sovereignty was exercised by them in its creation. It took its life, and all its attributes and capacities, from the State. Whatever powers, rights, and privileges it acquired from the United States it took under its contract with them, and not otherwise. The relation between the parties being that of contractors, the rights and obligations of both, as already stated, are to be measured by the terms and conditions of the contract. And when the government of the United States entered into that contract, it laid aside its sovereignty and put itself on terms of equality with its contractor. It was then but a civil corporation, as incapable as the Central Pacific of releasing itself from its obligations, or of finally determining their extent and character. It could not, as justly observed by one of the counsel who argued this case, "release itself and hold the other party to the contract. It could not change its obligations and hold its rights unchanged. It cannot bind itself as a civil corporation, and loose itself by its sovereign legislative power." This principle is aptly expressed by the great conservative statesman, Alexander Hamilton, in his report to Congress on the public credit, in 1795: "When a government," he observes, "enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered out of its power to legislate, unless in aid of them. It is, in theory, impossible to reconcile the two ideas of a promise which obliges with a power to make a law which can vary the effect of it." Hamilton's Works, vol. iii. pp. 518, 519.
When, therefore, the government of the United States entered into the contract with the Central Pacific, it could no more than a private corporation or a private individual finally *760 construe and determine the extent of the company's rights and liabilities. If it had cause of complaint against the company, it could not undertake itself, by legislative decree, to redress the grievance, but was compelled to seek redress as all other civil corporations are compelled, through the judicial tribunals. If the company was wasting its property, of which no allegation is made, or impairing the security of the government, the remedy by suit was ample. To declare that one of two contracting parties is entitled, under the contract between them, to the payment of a greater sum than is admitted to be payable, or to other or greater security than that given, is not a legislative function. It is judicial action; it is the exercise of judicial power,  and all such power, with respect to any transaction arising under the laws of the United States, is vested by the Constitution in the courts of the country.
In the case of The Commonwealth v. The Proprietors of New Bedford Bridge, a corporation of Massachusetts, the Supreme Court of that State, speaking with reference to a contract between the parties, uses this language: "Each has equal rights and privileges under it, and neither can interpret its terms authoritatively so as to control and bind the rights of the other. The Commonwealth has no more authority to construe the charter than the corporation. By becoming a party to a contract with its citizens the government divests itself of its sovereignty in respect to the terms and conditions of the contract and its construction and interpretation, and stands in the same position as a private individual. If it were otherwise, the rights of parties contracting with the government would be held at the caprice of the sovereign, and exposed to all the risks arising from the corrupt or ill-judged use of misguided power. The interpretation and construction of contracts when drawn in question belong exclusively to the judicial department of the government. The legislature has no more power to construe their own contracts with their citizens than those which individuals make with each other. They can do neither without exercising judicial powers which would be contrary to the elementary principles of our government, as set forth in the Declaration of Rights." 2 Gray, 350.
In that case the charter of the corporation authorized the *761 building of a toll-bridge across a navigable river, with two suitable draws at least thirty feet wide. A subsequent act required draws to be made of a greater width; but the court held that the question whether the draws already made were suitable, and constructed so as not unreasonably or unnecessarily to obstruct or impede public navigation, was not a question to be determined by the legislature, or by the corporation, but by the courts. It was a question which could not be authoritatively determined by either party so as to control and bind the other. "Like all other matters involving a controversy concerning public duty and private rights," said the court, "it is to be adjusted and settled in the regular tribunals, where questions of law and fact are adjudicated on fixed and established principles, and according to the forms and usages best adapted to secure the impartial administration of justice." In the case at bar, the government, by the act of 1878, undertakes to decide authoritatively what the obligations of the Central Pacific are, and in effect declares that if the directors of the company do not respect its construction, and obey its mandates, founded upon such construction, they shall be subject to fine and imprisonment.
The distinction between a judicial and a legislative act is well defined. The one determines what the law is, and what the rights of parties are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it. Wherever an act undertakes to determine a question of right or obligation, or of property, as the foundation upon which it proceeds, such act is to that extent a judicial one, and not the proper exercise of legislative functions. Thus an act of the legislature of Illinois authorizing the sale of the lands of an intestate, to raise a specific sum, to pay certain parties their claims against the estate of the deceased for moneys advanced and liabilities incurred, was held unconstitutional, on the ground that it involved a judicial determination that the estate was indebted to those parties for the moneys advanced and liabilities incurred. The ascertainment of indebtedness from one party to another, and a direction for its payment, the court considered to be judicial acts which could not be performed by the legislature. 3 Scam. 238. So also *762 an act of the legislature of Tennessee authorizing a guardian of infant heirs to sell certain lands of which their ancestor died seised, and directing the proceeds to be applied to the payment of the ancestor's debts, was, on similar grounds, held to be unconstitutional. Jones v. Perry, 10 Yerg. (Tenn.) 59. Tested by the principle thus illustrated, the act of 1878 must be held in many ways to transcend the legislative power of Congress.
I cannot assent to the doctrine which would ascribe to the Federal government a sovereign right to treat as it may choose corporations with which it deals, and would exempt it from that great law of morality which should bind all governments, as it binds all individuals, to do justice and keep faith. Because it was deemed important, on the adoption of the Constitution, in the light of what was known as tender laws, appraisement laws, stay laws, and instalment laws of the States, which Story says had prostrated all private credit and all private morals, to insert a clause prohibiting the States from passing any law impairing the obligation of contracts, and no clause prohibiting the Federal government from like legislation is found, it is argued that no such prohibition exists.
"It is true," as I had occasion to observe in another case, "there is no provision in the Constitution forbidding in express terms such legislation. And it is also true that there are express powers delegated to Congress, the execution of which necessarily operates to impair the obligation of contracts. It was the object of the framers of that instrument to create a national government, competent to represent the entire country in its relations with foreign nations, and to accomplish by its legislation measures of common interest to all the people, which the several States in their independent capacities were incapable of effecting, or if capable, the execution of which would be attended with great difficulty and embarrassment. They therefore clothed Congress with all the powers essential to the successful accomplishment of these ends, and carefully withheld the grant of all other powers. Some of the powers granted, from their very nature, interfere in their execution with contracts of parties. Thus war suspends intercourse and commerce between citizens or subjects of belligerent nations; it renders *763 during its continuance the performance of contracts previously made, unlawful. These incidental consequences were contemplated in the grant of the war power. So the regulation of commerce and the imposition of duties may so affect the prices of articles imported or manufactured as to essentially alter the value of previous contracts respecting them; but this incidental consequence was seen in the grant of the power over commerce and duties. There can be no valid objection to laws passed in execution of express powers, that consequences like these follow incidentally from their execution. But it is otherwise when such consequences do not follow incidentally, but are directly enacted."
"The only express authority for any legislation affecting the obligation of contracts is found in the power to establish a uniform system of bankruptcy, the direct object of which is to release insolvent debtors from their contracts upon the surrender of their property." 12 Wall. 663. From this express grant in the case of bankrupts the inference is deducible, that there was no general power to interfere with contracts. If such general power existed, there could have been no occasion for the delegation of an express power in the case of bankrupts. The argument for the general power from the absence of a special prohibition proceeds upon a misconception of the nature of the Federal government as one of limited powers. It can exercise only such powers as are specifically granted or are necessarily implied. All other powers, not prohibited to the States, are reserved to them or to the people. As I said in the case referred to, the doctrine that where a power is not expressly forbidden it may be exercised, would change the whole character of our government. According to the great commentators on the Constitution, and the opinions of the great jurists, who have studied and interpreted its meaning, the true doctrine is, that where a power is not in terms granted, and is not necessary or proper for the exercise of a power thus granted, it does not exist. It would not be pretended, for example, had there been no amendments to the Constitution as originally adopted, that Congress could have passed a law respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech, or the right of the people *764 to assemble and petition for a redress of grievances. The amendments prohibiting the exercise of any such power were adopted in the language of the preamble accompanying them, when presented to the States, "in order to prevent misconception or abuse" of the powers of the Constitution.
Independent of these views, there are many considerations which lead to the conclusion that the power to impair contracts, by direct action to that end, does not exist with the general government. In the first place, one of the objects of the Constitution, expressed in its preamble, was the establishment of justice, and what that meant in its relations to contracts is not left, as was justly said by the late Chief Justice, in Hepburn v. Griswold, to inference or conjecture. As he observes, at the time the Constitution was undergoing discussion in the convention, the Congress of the Confederation was engaged in framing the ordinance for the government of the Northwestern Territory, in which certain articles of compact were established between the people of the original States and the people of the Territory, for the purpose, as expressed in the instrument, of extending the fundamental principles of civil and religious liberty, upon which the States, their laws and constitutions, were erected. By that ordinance it was declared, that, in the just preservation of rights and property, "no law ought ever to be made, or have force in the said Territory, that shall, in any manner, interfere with or affect private contracts or engagements bona fide and without fraud previously formed." The same provision, adds the Chief Justice, found more condensed expression in the prohibition upon the States against impairing the obligation of contracts, which has ever been recognized as an efficient safeguard against injustice; and though the prohibition is not applied in terms to the government of the United States, he expressed the opinion, speaking for himself and the majority of the court at the time, that it was clear "that those who framed and those who adopted the Constitution intended that the spirit of this prohibition should pervade the entire body of legislation, and that the justice which the Constitution was ordained to establish was not thought by them to be compatible with legislation of an opposite tendency." 8 Wall. 623.
*765 Similar views are found expressed in the opinions of other judges of this court. In Calder v. Bull, which was here in 1798, Mr. Justice Chase said, that there were acts which the Federal and State legislatures could not do without exceeding their authority, and among them he mentioned a law which punished a citizen for an innocent act; a law that destroyed or impaired the lawful private contracts of citizens; a law that made a man judge in his own case; and a law that took the property from A. and gave it to B. "It is against all reason and justice," he added, "for a people to intrust a legislature with such powers, and therefore it cannot be presumed that they have done it. They may command what is right and prohibit what is wrong; but they cannot change innocence into guilt, or punish innocence as a crime, or violate the right of an antecedent lawful private contract, or the right of private property. To maintain that a Federal or State legislature possesses such powers if they had not been expressly restrained, would, in my opinion, be a political heresy altogether inadmissible in all free republican governments." 3 Dall. 388.
In Ogden v. Saunders, which was before this court in 1827, Mr. Justice Thompson, referring to the clauses of the Constitution prohibiting the State from passing a bill of attainder, an ex post facto law, or a law impairing the obligation of contracts, said: "Neither provision can strictly be considered as introducing any new principle, but only for greater security and safety to incorporate into this charter provisions admitted by all to be among the first principles of our government. No State court would, I presume, sanction and enforce an ex post facto law, if no such prohibition was contained in the Constitution of the United States; so, neither would retrospective laws, taking away vested rights, be enforced. Such laws are repugnant to those fundamental principles upon which every just system of laws is founded."
In the Federalist, Mr. Madison declared that laws impairing the obligation of contracts were contrary to the first principles of the social compact and to every principle of sound legislation; and in the Dartmouth College Case Mr. Webster contended that acts, which were there held to impair the obligation of contracts, were not the exercise of a power properly legislative, *766 as their object and effect was to take away vested rights. "To justify the taking away of vested rights," he said, "there must be a forfeiture, to adjudge upon and declare which is the proper province of the judiciary." Surely the Constitution would have failed to establish justice had it allowed the exercise of such a dangerous power to the Congress of the United States.
In the second place, legislation impairing the obligation of contracts impinges upon the provision of the Constitution which declares that no one shall be deprived of his property without due process of law; and that means by law in its regular course of administration through the courts of justice. Contracts are property, and a large portion of the wealth of the country exists in that form. Whatever impairs their value diminishes, therefore, the property of the owner; and if that be effected by direct legislative action operating upon the contract, forbidding its enforcement or transfer, or otherwise restricting its use, the owner is as much deprived of his property without due process of law as if the contract were impounded, or the value it represents were in terms wholly or partially confiscated.
In the case at bar the contract with the Central Pacific is, as I have said, changed in essential particulars. The company is compelled to accept it in its changed form, and by legislative decree, without the intervention of the courts, that is, without due process of law, to pay out of its earnings each year to its contractors, the United States, or deposit with them, a sum that may amount to $1,200,000, and this, twenty years before the debt to which it is to be applied becomes due and payable by the company. If this taking of the earnings of the company and keeping them from its use during these twenty years to come is not depriving the company of its property, it would be difficult to give any meaning to the provision of the Constitution. It will only be necessary hereafter to give to the seizure of another's property or earnings a new name,  to call it the creation of a sinking-fund, or the providing against the possible wastefulness or improvidence of the owner,  to get rid of the constitutional restraint. To my mind the evasion of that clause, the frittering away of all sense and meaning to it, are insuperable objections to the legislation of Congress. Where contracts are impaired, or when operating against the government *767 are sought to be evaded and avoided by legislation, a blow is given to the security of all property. If the government will not keep its faith, little better can be expected from the citizen. If contracts are not observed, no property will in the end be respected; and all history shows that rights of persons are unsafe where property is insecure. Protection to one goes with protection to the other; and there can be neither prosperity nor progress where this foundation of all just government is unsettled. "The moment," said the elder Adams, "the idea is admitted into society that property is not as sacred as the laws of God, and that there is not a force of law and public justice to protect it, anarchy and tyranny commence."
I am aware of the opinion which prevails generally that the Pacific railroad corporations have, by their accumulation of wealth, and the numbers in their employ, become so powerful as to be disturbing and dangerous influences in the legislation of the country; and that they should, therefore, be brought by stringent measures into subjection to the State. This may be true; I do not say that it is not; but if it is, it furnishes no justification for the repudiation or evasion of the contracts made with them by the government. The law that protects the wealth of the most powerful, protects also the earnings of the most humble; and the law which would confiscate the property of the one would in the end take the earnings of the other.
There are many other objections to the act of Congress besides those I have mentioned, each to my mind convincing; but why add to what has already been said? If the reasons given will not convince, neither would any others which could be presented. I will, therefore, refer only to the interference of the law with the rights of the State of California.
The Central Pacific being a State corporation, the law creating it is, by the Constitution of California, subject to alteration, amendment, and repeal by its legislature at any time,  a power which the legislature can neither abdicate nor transfer. In its assent given to the company to extend its road into the territory of the United States,  the general government having authorized the extension,  the legislature reserved the same control which it possesses over other railroad and telegraph companies *768 created by it. That control under the new constitution goes, as is claimed, to the extent of regulating the fares and freights of the company, thus limiting its income or earnings; and of supervising all its business, even to the keeping of its accounts, making disobedience of its directors to the regulations established for its management punishable by fine and imprisonment; and the legislature may impose the additional penalty of a forfeiture of the franchises and privileges of the company. The law in existence when the corporation was created, and still in force, requires the creation of a sinking-fund by the company to meet its bonds, and under it large sums have been accumulated for that purpose, and still further sums must be raised. In a word, the law of the State undertakes to control and manage the corporation, in all particulars required for the service, convenience, and protection of the public; and can there be a doubt in the mind of any one that over its own creations the State has, within its own territory, as against the United States, the superior authority? Yet the power asserted by the general government in the passage of the act of 1878 would justify legislation affecting all the affairs of the company, both in the State and in the Territories of the United States. It could treble the amount of the sum to be annually deposited in the sinking-fund; it could command the immediate deposit of the entire amount of the ultimate indebtedness; it could change the order of the liens held by the government and the first-mortgage bondholders; it could extend the lien of the government beyond the property to the entire income of the company, and, in fact, does so by the act in question (sect. 9); it could require the transportation for the government to be made without compensation; and it could subject the company to burdens which, if anticipated at the time, would have prevented the construction of the road. A power thus vast, once admitted to exist, might be exerted to control the entire affairs of the company, in direct conflict with the legislation of the State; its exercise would be a mere matter of legislative discretion in Congress. Yet it is clear that both governments cannot control and manage the company in the same territory, subjecting its directors to fine and imprisonment for disobeying their regulations. Under the Constitution the management of local *769 affairs is left chiefly to the States, and it never entered into the conception of its framers that under it the creations of the States could be taken from their control. Certain it is that over no subject is it more important for their interests that they should retain the management and direction than over corporations brought into existence by them. The decision of the majority goes a great way  further, it appears to me, than any heretofore made by the court  to weaken the authority of the States, in this respect, as against the will of Congress. According to my understanding of its scope and reach, the United States have only to make a contract with a State corporation, and a loan to it, to oust the jurisdiction of the State, and place the corporation under their direction. It would seem plain that if legislation, taking institutions of the State from its control, can be sustained by this court, the government will drift from the limited and well-guarded system established by our fathers into a centralized and consolidated government.