(88 Misc. Rep. 475)

McCLEMENT v. SUPREME COURT, I. O. F.

(Supreme Court, Equity Term, Jefferson County. December, 1914.)

1. INSURANCE ☞712 — FOREIGN INSURANCE COMPANY — CONSTRUCTION OF POLICY—WHAT LAW GOVERNS.

A certificate of insurance issued by a fraternal association, organized in Canada and authorized to do business in New York, delivered in 1893 to a member of a subordinate court of the order at his residence in New York, where the final acts to give validity to the certificate were performed, was a New York contract, the construction of which was to be determined by the law of New York.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 173–175; Dec. Dig. ☞712.]

2. CONTRACTS ☞2, 144, 276—CONSTRUCTION—WHAT LAW GOVERNS.

Matters bearing on the construction and validity of a contract must be determined by the law of the place where it was made, but all matters connected with its performance are regulated by the law of the place of performance.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 2, 41, 145, 724–727, 1216; Dec. Dig. ☞2, 144, 276.]

3. INSURANCE ☞719—FOREIGN INSURANCE COMPANY—AMENDMENT TO BY-LAWS—VALIDITY.

An amendment to the by-laws of a fraternal association, organized in Canada and authorized to do business in New York, was in violation of vested contract rights of a member residing in New York and holding a certificate of insurance governed by the laws of this state, where it increased the monthly rate of assessment without consent of such member, though the certificate stipulated that it was issued subject to the provisions of the by-laws prescribed from time to time by the Supreme Court

of the order; such stipulation having reference only to reasonable amendments relating to the economic administration of the society's affairs, and not authorizing amendments interfering with or destroying vested contract rights.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1855; Dec. Dig. ☞719.]

4. INSURANCE ☞719 — FOREIGN INSURANCE ASSOCIATION — VIOLATION OF VESTED RIGHTS—RIGHT OF ACTION.

Where the Supreme Court of a fraternal association, organized in Canada and authorized to do business in New York, in violation of vested contract rights, makes an extraordinary assessment which it declares a lien on the certificate of a member residing in New York, the member may sue in New York to set aside the assessment and remove the lien, though the assessment was authorized by the Parliament of the Dominion of Canada.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1855; Dec. Dig. ☞719.]

5. COURTS ☞512—COMITY—ENFORCEMENT OF FOREIGN LAWS.

Comity will not be exercised, where foreign laws sought to be enforced are contrary to the laws of the state, or would work injustice to citizens of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1432; Dec. Dig. ☞512.]

6. INSURANCE ☞17—FOREIGN INSURANCE COMPANY—SUBMISSION TO STATE LAW.

Where a foreign fraternal insurance association obtains permission to do an insurance business in New York, it submits to the laws of this state, and agrees to obey same, and conform to the public policy of the state.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 12; Dec. Dig. ☞17.]

Action by Henry McClement against the Supreme Court of the Independent Order of Foresters, to set aside an extraordinary assessment charged by defendant on plaintiff's certificate of insurance, and to remove the lien thereof from such certificate. Judgment for plaintiff.

Wm. H. Gilman and John Conboy, both of Watertown, for plaintiff.

Kellas, Genaway & Kellas, of Malone, Thos. G. Long and Elliott G. Stevenson, both of Detroit, Mich., and Geo. H. Cobb, of Watertown, for defendant.

EMERSON, J. The defendant is a fraternal insurance association, duly incorporated under the laws of the Dominion of Canada, having its head office in the city of Toronto. It was originally incorporated in the province of Ontario, but was reincorporated by the Dominion Parliament in the year 1889. The Supreme Court is the governing body, and it has a constitution and by-laws adopted by that court for conducting the business of the association. Its system of insurance is conducted upon the assessment plan, and is carried on by means of subordinate courts established by it pursuant to the terms of its charter.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the year 1892 the defendant applied for and obtained permission to do business as an insurance company in the state of New York, which permission still continues. Having obtained such permission, it organized a subordinate court in the city of Watertown, known as Court Watertown No. 465, and thereafter, and on December 29, 1892, the plaintiff, who then resided in the city of Watertown, became a member of that court. On the 7th day of January, 1893, the defendant issued, and on January 16, 1893, delivered to the plaintiff, its certificate or policy of insurance, which stated in substance that, in consideration of the statements and representations contained in the application for membership, the statements and answers contained in the medical examination papers, the provisions of the constitution and by-laws prescribed from time to time by the Supreme Court of the Independent Order of Foresters, all of which were assented to by plaintiff and were made part of said contract, and also in consideration of the statements and declarations contained in the obligations of subordinate courts, upon the faith of all of which said certificate was issued, said Supreme Court of the Independent Order of Foresters agreed to pay to the plaintiff on his reaching his seventieth birthday and on each subsequent birthday an annuity benefit of $200 until the full sum of $2,000 was paid, less any sum paid on account of total and permanent disability. It further agreed to pay, on satisfactory proof of total and permanent disability, as provided in the constitution and laws prescribed from time to time by said Supreme Court, a benefit of $1,000, and it further agreed to pay to the widow or other beneficiary therein designated, or to the personal representatives of the plaintiff, on due and satisfactory proof of his death, an endowment benefit of $2,000, less any sum previously paid on account of total and permanent disability or on account of the annuity benefit.

The plaintiff, at the time said certificate was issued, was nearing his thirty-sixth birthday, and he thereby became a member of the ordinary class and was required to pay the monthly assessment fixed by said by-laws to be paid by members of the age of 36 in said ordinary class.

The by-laws of said defendant in force at the time the plaintiff joined the order and said certificate or policy of insurance was executed and delivered provided that the monthly rate of assessment which every member in the ordinary class should pay who was of the age of 36 at the time of his registration should be 80 cents on each $1,000, or the sum of $1.60 on a policy for $2,000, and that he should pay the same rate of assessment thereafter as long as he remained continuously in good standing in the order and in the same class. Said by-laws further provided that, whenever there were no available funds to pay the endowment or other benefits of the order, the executive council should order a special assessment, which should be paid by each member into his subordinate court within 30 days from the date of the call, and the subordinate courts should forthwith transmit the same to the Supreme Secretary, and when such special assessment should be ordered and paid by the members it should be refunded to

them as soon as the funds of the society would permit, by the executive council remitting their monthly assessments till the extra sums paid by the members were fully repaid to them.

On joining the defendant the plaintiff was required to pay an initiation fee of $6.50 and the first assessment of $1.60 upon his policy, and he was required by said by-laws and did pay the annual dues of said local court, which were fixed at the sum of 45 cents per month. He thereafter complied with all the rules of defendant society, and at all times remained a member in good standing, and paid all dues, assessments, and charges against him which were levied by the defendant down to October 1, 1913, and the same were received and accepted by defendant.

In the year 1898 the defendant amended its by-laws by providing for an increased rate of monthly assessments as to those who should thereafter join the order, those who were of the age of plaintiff when he joined being required to pay $1.44 per month on each $1,000 insurance, or a total monthly assessment on a certificate for $2,000 of $2.88; but such amendment provided that it should not apply to members who joined before December 31, 1898, and who are therefore termed pre-99 members, all of whom, so long as they remained in good standing, should pay the rates which existed before such amendment.

In the year 1908 the defendant caused a valuation to be made of its assets and liabilities, and it was found that the present value of the certificates of insurance then outstanding exceeded the surplus mortuary fund on hand, together with the present value of future monthly assessments by the sum of $55,000,000, which sum represented a valuation deficiency according to standard mortality tables and the actuarial methods which were adopted. The defendant thereupon amended its by-laws by raising the monthly assessment rates of all pre-99 members, or those who joined before December 31, 1898, by which amendment the plaintiff was required to pay a monthly assessment of $1.72 on each $1,000 insurance, or a total monthly assessment on a certificate for $2,000 of $3.44. The rates of monthly assessments to be paid by members joining subsequently to December 31, 1898, was left as fixed by the amendment of 1898. The plaintiff, however, seems to have acquiesced in this increase of his monthly assessment, and has paid the same ever since.

In the year 1912 the defendant caused a further valuation of its assets and liabilities to be made, and it was found that the present value of the policies then outstanding was the sum of $91,288,417, or, including death claims then unsettled, $92,355,091. This left, after deducting the present value of future monthly assessments and the surplus mortuary fund on hand, a valuation deficiency of $23,830,402, thus showing that the valuation deficiency of $55,000,000 which existed in 1908 had, because of the increase of assessments made in that year, been reduced about 60 per cent. during the preceding four years. It was, however, found by the actuarial methods used that the valuation deficiency for the pre-99 members was $25,555,448, thus leaving a valuation surplus to members who joined after December

31, 1898, of $1,725,046. The same valuation showed that on December 31, 1912, the defendant had a surplus fund of $20,559,911, of which sum $6,245,661 arose from payments made by pre-99 members.

In the year 1913, upon the initiative and at the request of some of the chief officers of the defendant, the Dominion Parliament enacted a statute which took effect on May 16, 1913, and which permitted the defendant to classify all of its membership, those who joined prior to December 31, 1898, to constitute one class, those who joined between January 1, 1899, and July 1, 1911, to constitute another class, and those who joined subsequently to July 1, 1911, to constitute a third class. The defendant was authorized to require its members to pay such premiums or assessments as would provide, with the accumulated funds of the society applicable to mortuary benefits, for the payment of all obligations matured or to thereafter mature under such mortuary benefit certificates, whether theretofore or thereafter issued, without deduction or abatement, and to that end the defendant was authorized to determine the amount of the accumulated funds which arose from the payments made by members in each class, and such amount, together with future assessments to be received from the members in each class, was to be deemed applicable only to mortuary benefit certificates of members in such classes respectively. The defendant was further authorized to ascertain as of October 1, 1913, the valuation deficiency in respect to all outstanding mortuary benefit certificates of members who joined prior to January 1, 1899, and to apportion such valuation deficiency among said members in proportion to the amount of their mortuary benefit certificates. Said act further provided that, if it should be accepted by the Supreme Court of said society by a two-thirds vote, it should then take effect, in which event the defendant was authorized by resolution to charge against each mortuary benefit certificate issued prior to January 1, 1899, as an assessment, a sum not exceeding its proportion of the valuation deficiency aforesaid, which should become due and payable on October 1, 1913, and if not so paid to be a lien against said mortuary benefit certificate, bearing interest until paid at the rate of 4 per cent. per annum, compounded annually the same, together with such interest, to be deducted by the defendant from the moneys to be paid on such mortuary certificate.

The Supreme Court of said defendant thereafter accepted said act by a two-thirds vote, and proceeded to have another actuarial examination of its affairs made as of October 1, 1913, and it was found that on said date there was a valuation deficiency as to pre-99 members of liabilities over assets according to standard mortality tables of $24,500,000 which sum was about $1,000,000 less than the valuation deficiency charged to said members upon the actuarial examination made December 31, 1912, and which sum, less a surplus of $725,046, placed to credit of members joining after December 31, 1898 represented the total valuation deficiency of the defendant. The same examination showed that on October 1, 1913, out of the surplus funds then on hand, amounting to about $21,000,000, the sum of $6,000,000 had been accumulated from payments made by pre-99 members, and it also appeared that, after paying all claims which arose during the

year 1913, there was an accumulated surplus which was paid in by the whole membership during that year of over $300,000. Thereupon, acting under the authority of said act of Parliament, the Supreme Court proceeded by resolution to charge said valuation deficiency of $24,500,000 upon the pre-99 members and to apportion the same among said membership according to the amount of their respective certificates; the shares so charged to the plaintiff being the sum of $520. This amount the plaintiff was required to pay on or before October 1, 1913, and in default of said payment it was declared to be a lien upon his certificate of insurance, with interest at the rate of 4 per cent., compounded annually, the whole amount thereof to be deducted from any sum which should thereafter become payable on said certificate. The plaintiff protested against said charge and lien, and refused to pay the same, and subsequently to October 1, 1913, brought this action to set aside said lien and charge, and to have his policy restored to its original amount, and he asserts that the imposition of the same was a violation of his contract rights, and therefore invalid.

There was considerable evidence given upon the trial bearing upon the necessity and fairness of the sum thus charged against the pre-99 membership, and, if that inquiry was necessarily involved, much could be said on either side of the question. It seems to me, however, that it is more a question of power in the defendant to make the charge and create the lien in question, for if it possessed such power it is hardly the province of the court to control the discretionary exercise of the same.

In determining this question of power, we must first ascertain whether the contract made between the parties is to be construed, and the rights of the parties determined, according to the laws of the state of New York, or those of the Dominion of Canada. The method pursued in joining the defendant and in the issuance of plaintiff's certificate of insurance was as follows:

The plaintiff, who resided in the city of Watertown, presented his petition for membership to Court Watertown No. 465, which was referred to a committee, who having reported favorably upon the application, he was balloted for and elected. He was then examined by the subordinate court physician, and the medical examination forwarded to the home office in Toronto, and the same having been approved by the chief medical examiner of the Supreme Court and returned with such approval to the subordinate court, it proceeded to initiate him as a member. At the time of his initiation he paid the initiation fee and his first assessment, and the recording secretary of the court thereupon completed his application for membership by filling in the date of his initiation, and such application, with the certificate of such secretary, was by him then forwarded to the home office, where he was registered and enrolled as a member in the department of the Supreme Secretary. In a few days the certificate or policy of insurance was made out and forwarded to the subordinate court for delivery. Before delivery, however, the by-laws provided that it must be signed by the member thus insured, and such signature duly witnessed by the chief ranger of his court, and countersigned by the recording secretary, with the seal of the court attached (By-

Laws 1890, § 250), which being done, the certificate or policy in question was delivered to the plaintiff at his home court in Watertown. Thereafter, as assessments came due, they were paid to said subordinate court, and by it transmitted to the Supreme Treasurer at the home office in Toronto.

[1] From this statement of facts it clearly appears that the contract in question was made in the state of New York. There it was delivered, and the final acts which were requisite to give vitality to it as a contract were there performed. A contract is made where the final acts are done which are essential to its validity and where it is in fact delivered. Meyer v. Knights of Pythias, 178 N. Y. 63, 70 N. E. 111, 64 L. R. A. 839; Whart. Confl. Laws (2d Ed.) § 421; Voight v. Brown, 42 Hunt, 394; Milliken v. Pratt, 125 Mass. 374, 376, 28 Am. Rep. 241; Holder v. Aultman, 169 U. S. 81, 18 Sup. Ct. 269, 42 L. Ed. 669; Stein-Gray Drug Co. v. Michelsen Co. (Mun. Ct.) 116 N. Y. Supp. 789. A contract of insurance is made, not where the policy was executed, but where it was in fact delivered. South Bay Co. v. Howey, 113 App. Div. 383, 385, 386, 98 N. Y. Supp. 909; Swing v. Dayton, 124 App. Div. 58, 108 N. Y. Supp. 155, affirmed on opinion below 196 N. Y. 503, 89 N. E. 1113. And, indeed, if there was ever any doubt upon the subject, it has finally been set at rest by the decisions of the United States courts that a policy of insurance, made out in one state and delivered in another, is a contract made in the state where it was delivered. Knights Templar & Masons' Indemnity Co. v. Berry, 50 Fed. 511, 1 C. C. A. 561; Equitable Life Ass. Society v. Winning, 58 Fed. 541, 7 C. C. A. 359; Equitable Life Ass. Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, 35 L. Ed. 497; Mutual Life Ins. Co. v. Cohen, 179 U. S. 262, 265, 21 Sup. Ct. 106, 45 L. Ed. 181; Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 24 Sup. Ct. 538, 48 L. Ed. 788.

[2] The authorities, in relation to what law shall govern in the construction of contracts made in one jurisdiction to be performed in another, do not seem to be in perfect harmony. It was laid down many years ago as a general rule that the law of the place where a contract is made determines its nature, validity, obligation, and legal effect, and also prescribes the rules for its construction and interpretation, unless it appears that it was to be performed in another place, or was made with reference to the laws and usages of such other place, in which case, following the rule of the presumed intention of the parties, the law of the place of performance furnishes the guide for its construction and interpretation. This rule seems to have been steadily adhered to by the courts until a comparatively recent period. Sherrill v. Hopkins, 1 Cow. 103; Dyke v. Erie R. R., 45 N. Y. 113, 116, 6 Am. Rep. 43; Jewell v. Wright, 30 N. Y. 264, 86 Am. Dec. 372; Merchants' Bank of Canada v. Griswold, 72 N. Y. 473, 480, 28 Am. Rep. 159; Curtis v. Delaware, L. & W. R. R. Co., 74 N. Y. 116, 120, 30 Am. Rep. 271; Interstate Steamboat Co. v. First Nat. Bank, 87 Hun, 93, 33 N. Y. Supp. 966. The more recent cases, however, lay down the rule that all matters bearing upon the construction, interpretation, and validity of a contract must be determined by the law of the place where the contract was made, while all matters con-

nected with its performance are regulated by the law of the place of performance. Scudder v. Union Nat. Bank, 91 U. S. 406, 413, 23 L. Ed. 245; Union Nat. Bank v. Chapman, 169 N. Y. 538, 543, 62 N. E. 672, 57 L. R. A. 513, 88 Am. St. Rep. 614; Stumpf v. Hallahan, 101 App. Div. 383, 91 N. Y. Supp. 1062; Hooley v. Talcott, 129 App. Div. 236, 113 N. Y. Supp. 820.

The distinction, if any, between these rules, is, however, unimportant in this case; for, as we have seen, the contract of insurance was made in this state, and, as no place of performance is specified in the contract, presumptively it was to be performed in the place where the contract was made. Pomeroy v. Ainsworth, 22 Barb. 120, 128; Stumpf v. Hallahan, 101 App. Div. 383, 91 N. Y. Supp. 1062; 2 Whart. Contr. § 72; 5 Lawson Rights & Rem. 4142; Perry v. Erie Transfer Co. (Com. Pl.) 19 N. Y. Supp. 239; Cahill Iron Works v. Pemberton (Com. Pl.) 27 N. Y. Supp. 927, 931. And besides, as no place for the payment of the sum insured is mentioned, it would be the duty of the debtor to search out the creditor and pay him personally, if he was to be found within the state. Smith v. Smith, 25 Wend. 406; Hale v. Patton, 60 N. Y. 236, 19 Am. Rep. 168; Stoker v. Cogswell, 25 How. Prac. 274.

The party insured resides within the state of New York, and, while the place of payment is by no means controlling, it is nevertheless a factor in determining where the contract is to be performed. On all the facts I conclude that the contract was also to be performed within this state. The construction of the contract and the rights of the parties thereunder must therefore be determined by the laws of our state.

[3-5] Turning now to the contract in question, we find that in consideration of the plaintiff's complying with the constitution and by-laws of the defendant it agreed to pay him, on arriving at the age of 70 years, an annuity of $200 until the whole sum of $2,000 was paid, or in case of total and permanent disability the sum of $1,000, or upon his death to his widow or personal representatives the sum of $2,000. The by-laws in existence at the time the plaintiff joined the defendant provided that the plaintiff should pay a monthly assessment upon the certificate or policy aforesaid of $1.60, and that he should pay the same rate of assessment thereafter so long as he remained in good standing in the order and in the class in which he was thus insured. This was the only requirement of the by-laws as to payments by the plaintiff, except the levying of special assessments which the executive council was authorized to make in emergency cases. Manifestly these special assessments were to be made at the same rate as the regular monthly assessments, and they could only be ordered when the defendant had no available funds to pay the certificates of insurance as they matured, and when such special assessments were ordered they were to be refunded to the members as soon as the funds of the defendant would permit. Furthermore, at the time the action complained of was taken by defendant, it had a surplus fund of about $20,000,000, so there can be no claim that said action was authorized under the power contained in the by-laws to levy special assessments.

The certificate of insurance issued to plaintiff, in connection with

the constitution and by-laws then in existence, constituted his contract with defendant. Matter of Equitable Reserve Fund Life Ass'n, 131 N. Y. 369, 30 N. E. 114; Sabin v. Phinney, 134 N. Y. 428, 31 N. E. 1087, 30 Am. St. Rep. 681; People v. Life & Reserve Ass'n, 150 N. Y. 94, 108, 45 N. E. 8; People v. Grand Lodge of Empire Order, 156 N. Y. 533, 537, 538, 51 N. E. 299; Shipman v. Protected Home Circle, 174 N. Y. 409, 67 N. E. 83, 63 L. R. A. 347. And that under such a contract an amendment of the by-laws, without the consent of a member and without special reservation of the right to make such amendment, which increased the monthly rate of assessment, violated his contract rights, is no longer an open question in this state. Wright v. Knights of Maccabees, 196 N. Y. 391, 89 N. E. 1078, 31 L. R. A. (N. S.) 423, 134 Am. St. Rep. 838; Green v. Royal Arcanum, 206 N. Y. 591, 100 N. E. 411.

An examination of the contract in question will not show, in my judgment, any such reservation of power. True, the certificate states on its face that it is issued in consideration, among other things, of the provisions of the constitution and laws prescribed from time to time by the Supreme Court, all of which are assented to by the plaintiff and made part of the contract; but it has been frequently held that such a provision did not authorize any amendment which increased the rate of assessment as to existing contracts. Langan v. American Legion of Honor, 174 N. Y. 266, 66 N. E. 932; Shipman v. Protected Home Circle, 174 N. Y. 398, 404, 67 N. E. 83, 63 L. R. A. 347; Beach v. Supreme Tent, 177 N. Y. 101, 69 N. E. 281; Ayers v. Order of United Workmen, 188 N. Y. 281, 80 N. E. 1020.

It is equally well settled that such reservation has reference only to reasonable amendments relating to the economic administration of the affairs of the society, and does not authorize amendments that interfere with or destroy vested contract rights. See cases above cited; also Kent v. Quicksilver Mining Co., 78 N. Y. 159; Matthews v. Associated Press, 136 N. Y. 342, 32 N. E. 981, 32 Am. St. Rep. 741; Engelheart v. Fifth Ward D. S. & Loan Ass'n, 148 N. Y. 281, 287, 42 N. E. 710, 35 L. R. A. 289; Parish v. New York Produce Exchange, 169 N. Y. 35, 61 N. E. 977, 56 L. R. A. 149; Evans v. Southern Tier Masonic Relief Ass'n, 182 N. Y. 453, 75 N. E. 317; Wright v. Knights of Maccabees, 196 N. Y. 391, 89 N. E. 1078, 31 L. R. A. (N. S.) 423, 134 Am. St. Rep. 838; Green v. Royal Arcanum, 206 N. Y. 591, 595, 100 N. E. 411.

There was also upon the back of the certificate a printed clause signed by plaintiff, whereby he expressly agrees that the constitution and laws of the Independent Order of Foresters, as well as any amendments thereof which may be adopted from time to time by the Supreme Court, shall be a part of this contract; particular reference being made by the parties thereto to 93 different sections of the constitution and by-laws, among which is section 237, which fixed the monthly rate of assessment when the plaintiff joined the defendant.

I do not think that defendant's contentions gain additional force from the special reference thus made to certain sections of the by-laws. This reference, as above stated, is to 93 different sections, or over one-third in number of all the sections contained in the consti-

tution and by-laws of defendant. In order, therefore, to understand what this reservation of power to amend related to, he must examine 93 different sections, and then all he would be informed was that the defendant reserved the right to make new by-laws in place of the same. Such a reference is little, if any, better than saying that particular and special reference is made to all of the sections contained in said constitution and by-laws.

It was said by Cullen, C. J., in Beach v. Supreme Tent, 177 N. Y. 101, 69 N. E. 281, that nothing less than an explicit statement that power was reserved to amend the by-laws, so as to raise the rate of assessment, would be sufficient to confer such authority. It is clear, therefore, that as to existing contracts such power did not arise from the general language used in the certificate, and unless the action of defendant has some other ground of support, it was invalid, as being in violation of the plaintiff's contract rights. Boswell v. Security Mutual Life Ins. Co., 193 N. Y. 465, 473, 474, 86 N. E. 532, 19 L. R. A. (N. S.) 946.

But it is urged by the counsel for defendant that it was incorporated by the Parliament of the Dominion of Canada, that such Parliament has unlimited power to alter, amend, or repeal such charter, and that, acting under such authority, it amended the charter of defendant by authorizing the levying of this special assessment, and that, not being restrained by any written constitution, it had full power to authorize the levying of the same, notwithstanding it violated vested contract rights; that as a corporation is the creature of a statute, it carries its charter with it wherever it goes, and that such charter, with amendments enacted thereto, must be given the same force and effect elsewhere that it has in the place of its creation. To a person living in a country where individual rights are safeguarded by constitutional limitations and restrictions, such a proposition would seem to be both novel and unique. However, to test the accuracy of this proposition, it will be useful to inquire to what extent similar legislation in a country subject to constitutional restrictions and limitations will be enforced by our courts, and whether greater weight will be given to the statutory enactments of a foreign country whose Parliament is not restrained by any constitutional provisions.

It was held in the Dartmouth College Case, 4 Wheat. 518, 4 L. Ed. 629, that the granting of a charter to a corporation was a contract between the body granting the same and the members of the corporation, and that any act of the former which altered the charter in a material respect without the consent of the corporation impaired the obligation of such contract, and was therefore unconstitutional and void. In that case Dartmouth College had been chartered by the British crown as a great public educational enterprise, and the statute which was condemned was an act of the Legislature of New Hampshire which sought to take the management of the college out of the hands of the board of trustees provided in the charter and to confer it upon a board consisting of certain state officers as ex officio members, the balance to be appointed by the Governor and state counsel of that state on the theory that the continuance of its management under trustees named by the crown and their successors was contrary to the

genius of our institutions, and that the educational atmosphere existing under such circumstances would exercise a baleful influence upon the students in the college. Roused by the danger liable to result to the public interests from this decision, as soon as its full import and extent became generally known, most, if not all, of the states enacted statutes reserving power in the Legislature to alter, suspend, or repeal the charter of every corporation. Such a statute was enacted in our own state in the Revised Statutes of 1828, and has ever since continued to be the law of this state.

The extent to which this power of amendment, suspension, and repeal may be exercised by the Legislature has been frequently before the courts, and much has been written upon the subject. It is said in a standard work on Corporations that the effect of these statutes is to validate such legislation as was condemned in the Dartmouth College Case, and the only right of amendment which they confer is such as would have existed, had that case decided that the federal Constitution did not apply to corporate charters; that, as a consequence, the right reserved was in the nature of a police power, and could only be exercised without the consent of the corporation in matters wherein the public interests are involved; that in the exercise of that power the Legislature cannot change the whole character of the enterprise, or make material and fundamental changes from the original plan, without the unanimous consent of all the stockholders. In this regard the learned author seems to have the support of the authorities. 2 Cook, Corp. (7th Ed.) §§ 499, 500, 501; Tomlinson v. Jessup, 15 Wall. 454, 458, 21 L. Ed. 204; Miller v. New York, 15 Wall. 498, 21 L. Ed. 98; Sinking Fund Cases, 99 U. S. 700, 719, 720, 25 L. Ed. 496; Larabee v. Dolley (C. C.) 175 Fed. 391; Avondale Land Co. v. Shook, 170 Ala. 379, 54 South. 268; Orr v. Bracken Co., 81 Ky. 593; Cross v. Peach Bottom R. Co., 90 Pa. 392, 395; Zabriskie v. Hackensack & N. Y. R. Co., 18 N. J. Eq. 178, 90 Am. Dec. 617; Lord v. Equitable Life Assur. Soc., 194 N. Y. 236, 237, 87 N. E. 443, 22 L. R. A. (N. S.) 420. The Supreme Court of the United States, however, sums up this power of amendment as follows:

"A power reserved to the Legislature to alter, amend, or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the Legislature may deem necessary to secure either that object or any public right." New York & N. E. R. R. Co. v. Bristol, 151 U. S. 556, 567, 14 Sup. Ct. 437, 38 L. Ed. 269; Close v. Glenwood Cemetery, 107 U. S. 476, 2 Sup. Ct. 267, 27 L. Ed. 408; Holyoke Co. v. Lyman, 15 Wall. 522, 21 L. Ed. 133; Sinking Fund Cases, 99 U. S. 720, 25 L. Ed. 496; Berea College v. Kentucky, 211 U. S. 45, 57. 29 Sup. Ct. 33, 53 L. Ed. 81.

But, whatever is the extent of this power and the restrictions and limitations placed upon its exercise, all the cases seem to agree that it cannot be exercised in any manner so as to interfere with vested rights or impair the obligation of existing contracts. People v. O'Brien, 111 N. Y. 2, 37, 48, 49, 52, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; Lord v. Equitable Life Assur. Society, 194 N. Y. 213, 227, 236, 237, 87 N. E. 443, 22 L. R. A. (N. S.) 420; Commonwealth v. Essex Co., 13 Gray (Mass.) 239, 253, per Shaw, Ch. J.; Detroit v. De-

troit & Howell Plankroad Co., 43 Mich. 141, 147, 5 N. W. 275, per Cooley, J.; Atty. Gen. v. Looker, 111 Mich. 498, 69 N. W. 929, 56 L. R. A. 947; Smith v. Lake Shore & M. S. R. Co., 114 Mich. 472, 473, 72 N. W. 328; Sinking Fund Cases, 99 U. S. 720, 749, 25 L. Ed. 496.

In this connection it is well to observe that the Supreme Court of the United States says a vested right is property protected by the Constitution, whether it springs from contract or from the principles of the common law (Pritchard v. Norton, 106 U. S. 132, 1 Sup. Ct. 102, 27 L. Ed. 104), and that our own Court of Appeals says in relation to amendments of by-laws authorized by the Legislature that all by-laws must be reasonable and that any act of the Legislature permitting a corporation to alter, amend, or repeal its by-laws does not authorize an amendment interfering with vested rights, as such an amendment would not be reasonable. Parish v. New York Produce Exchange, 169 N. Y. 48, 61 N. E. 977, 56 L. R. A. 149; Beach v. Supreme Tent, 177 N. Y. 104, 69 N. E. 281.

Attention also may well be directed to the distinction pointed out by Judge Vann in Lord v. Equitable Life Assur. Society, 194 N. Y. 213, 87 N. E. 443, 22 L. R. A. (N. S.) 420, between the general franchise granted to a corporation, consisting solely of the charter creating the corporation, and giving it a right to do business, and its special franchises, which invest it with property rights. The former may be amended or repealed by the Legislature, while the latter are protected by the Constitution from legislative impairment. Railroad Co. v. Maine, 96 U. S. 500, 510, 511, 24 L. Ed. 836, and Gordon v. Appeal Tax Court, 44 U. S. (3 How.) 133, 11 L. Ed. 529, are also to like effect.

The defendant's counsel, however, attack the proposition above laid down as to vested rights, and cite a line of cases where they claim such rights have been disregarded by our courts in altering or amending the charters of corporations. I think an examination of these cases will show that they are entirely consistent with the above rule. The main case relied on is Matter of Lee Bank, 21 N. Y. 9. In that case the bank was organized in 1844 under the general banking law and issued bank notes for circulation as money. The articles of association and certificate of incorporation provided that the shareholders should not be liable as individuals for any contract, debt, or engagement of the association. The Constitution of 1846 thereafter provided that the stockholders in every banking institution issuing bank notes to circulate as money should after January 1, 1850, be individually responsible to the amount of the shares of stock so held by the them for all debts and liabilities contracted after that date. It was held that, as there was power to alter, amend, or repeal the charter of the corporation, this was a repeal pro tanto of the same, that it was optional with the corporation whether to continue the issuing of bank notes under the amended charter, three years being allowed for the purpose of exercising that option, and if after the expiration of that time they continued to so issue such bank notes the stockholders were made individually liable for debts incurred after that date, and

that, as the stockholders joined the association with full knowledge of the power to alter, amend, or repeal their charter, they in effect assented that such change might be made. If this legislation had a retroactive effect, and had made stockholders liable for a pre-existing indebtedness, it doubtless would have been in violation of vested rights; but it did nothing of the kind. It merely had reference to a prospective indebtedness which, within all the authorities, was not a violation of the stockholders' contract rights. 2 Cook, Corp. (7th Ed.) § 501. See, also, Gray v. Coffin, 9 Cush. (Mass.) 200; Commonwealth v. Cochituate Bank, 85 Mass. (3 Allen) 43, 44; Coffin v. Rich, 45 Me. 507, 509, 71 Am. Dec. 559.

The conclusion necessarily results from the foregoing authorities that domestic legislation which alters, amends, or repeals corporate charters is powerless to affect vested contract rights. This being so, why should the enactments of the parliament of a foreign country be given a greater weight and effect? The theory under which courts of one jurisdiction give effect to the laws, written or unwritten, of a foreign state or country, is that of private international law, or what is popularly called the comity of nations. This comity is not a matter of right, but of grace or courtesy, extended by the courts of one jurisdiction to another state or nation. It is an elementary rule in the conflict of laws that such comity will not be exercised where the laws sought to be enforced are contrary to the policy of our laws, or would work injustice to our citizens.

Story, in his Conflict of Laws, cites with approval the statement of Huberus (Lib. 1, tit. 3) that it is an axiom that the laws of every people in force in their own jurisdiction ought to have the same force everywhere, so far as they do not prejudice the powers or rights of other governments or their citizens, and, commenting upon this axiom of Huberus, Story says:

"It seems. irresistibly to flow from the rights and duties of every nation to protect its own subjects against injuries resulting from the unjust and prejudicial influence of foreign laws and to refuse its aid to carry into effect any foreign law which is repugnant to its own interests and polity." Story, Confl. Laws (7th Ed.) § 31.

Story further says:

"The obligatory force of the laws of any nation cannot extend beyond its own territory, and if such laws are incompatible with the laws of the country where such subjects reside, they will be disregarded by the latter. Every nation has an exclusive right to regulate persons and things within its own territory according to its own sovereign will and policy." Id. § 22.

"The state may interdict the administration of some foreign laws and it may favor the introduction of others. When its own Code speaks positively upon the subject, it must be obeyed by all persons who are within the reach of its sovereignty; and when its customary, unwritten, or common law speaks directly on the subject, it is equally to be obeyed. Where both are silent, then and then only can the question properly arise what law is to govern, in the absence of any clear declaration of the sovereign will." Id. § 23.

"No nation will suffer the laws of another to interfere with her own, to the injury of her citizens." Id. § 29.

"It is difficult to conceive upon what ground a claim can be rested to give any municipal laws an extraterritorial effect, where those laws are prejudicial to the rights of other nations or to those of their subjects. It would at once annihilate the sovereignty and equality of every nation which should be called

upon to recognize and enforce them, or compel it to desert its own proper interests and duty to its own subjects in favor of strangers, who were regardless of both. A claim so naked of any principle or just authority to support it is wholly inadmissible." Id. § 32.

Finally Story says:

"The rule that foreign laws which are repugnant to the fundamental principles of the lex fori cannot claim adoption under the general comity of nations in the administration of private international jurisprudence has lately received formal recognition in the House of Lords. 3 Macq. H. L. Cas. 497. It. is there said that 'If the adoption of the law of domicile would occasion prejudice to the rights of other states and their citizens, or if it would contravene a prohibitory enactment the comity of nations would not require its adoption.' " Id. § 373.

The decisions of our courts are all to like effect. Thus in Huntington v. Attrill, 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123, it is said that:

"Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states."

Oliver v. Townes, 2 Mart. N. S. (La.) 98, is a leading case on the subject. The court there says that:

Where the laws of a foreign state "clash with and interfere with the rights of the citizens of the countries where the parties to the contract seek to enforce it, as one or other * * * must give way, those prevailing where the relief is sought must have the preference."

And in 22 American and English Encyclopedia of Law (2d Ed.) 1319, the rule is laid down that the laws of a foreign country will not be enforced if such enforcement would contravene the settled policy of the former or be prejudicial to the interests of its citizens. There are many other decisions of our state courts to like effect, among which may be noted that of Pearsall v. Dwight, 2 Mass. 89, 3 Am. Dec. 35, where Parsons, C. J., says:

"To give effect to contracts made in another state is an act of comity due from the courts of the state in which such contracts may be sued to the state in which they may be made. This rule is subject to two important exceptions. First, that neither the state * * * nor its citizens, may suffer any inconvenience by giving the contract effect."

Also Edgerly v. Bush, 81 N. Y. 199, where Folger, C. J., says that force and effect will not be given to the statutes of Lower Canada, when they contravene our policy or inconvenience our citizens.

[6] The defendant applied for and obtained permission to execute contracts of insurance within the state of New York, and in so doing submitted to our laws and agreed to obey the same and conform to the public policy of our state. People v. Formosa, 131 N. Y. 478, 30 N. E. 492, 27 Am. St. Rep. 612; Morgan v. Mutual Benefit Life Ins. Co., 189 N. Y. 447, 82 N. E. 438; Boswell v. Security Mutual Life Ins. Co., 193 N. Y. 475, 86 N. E. 532, 19 L. R. A. (N. S.) 946. Henceforth it was regarded as a corporation domiciled in this state, and subject to the same obligations and liabilities as a domestic corporation. Martine v. International Life Ins. Co. Society, 53 N. Y. 339, 346, 347, 13 Am. Rep. 529; New England Mutual Life Ins. Co.

v. Woodworth, 111 U. S. 138, 145, 4 Sup. Ct. 364, 28 L. Ed. 379; Hollis v. Drew Theological Seminary, 95 N. Y. 175. And the contract in question having been made under such authority, and as the same is to be performed in this state, all questions as to its validity, construction, and effect, and also as to the validity of any modification thereof, must be determined by our laws. To that end all of our laws in that regard formed a part of such contract in the same manner as if expressly referred to and incorporated in its terms. Trustees of Brookhaven v. Smith, 98 App. Div. 212, 213, 90 N. Y. Supp. 646; McCracken v. Hayward, 2 How. 608, 612, 11 L. Ed. 397; Von Hoffman v. City of Quincy, 4 Wall. 550, 18 L. Ed. 403; Pritchard v. Norton, 106 U. S. 124, 136, 1 Sup. Ct. 102, 27 L. Ed. 104; Barnitz v. Beverly, 163 U. S. 118, 125, 16 Sup. Ct. 1042, 41 L. Ed. 93.

Not only must the rights of the parties be determined according to our laws, but, as they speak positively upon the subject, they must, as Story says, be obeyed by all without regard to the laws of their domicile. So, also, as is said in the Louisiana case above cited, if the laws of this state conflict with the laws of a foreign state, the latter must give way, and the former be given the preference. But, aside from this, the policy of our state is to sacredly regard the obligations of contracts and sedulously to condemn anything that interferes with vested rights under the same. The legislation of the Dominion of Canada involved in this case totally disregards such obligations and vested rights, and is therefore contrary to our public policy and injurious to our citizens, and hence no comity requires us to give effect to the same. Dearing v. McKinnon D. & H. Co., 165 N. Y. 78, 87, 58 N. E. 773, 80 Am. St. Rep. 708; Edgerly v. Bush, 81 N. Y. 199, 204; Marshall v. Sherman, 148 N. Y. 11, 25, 42 N. E. 419, 34 L. R. A. 757, 51 Am. St. Rep. 654. Any other result would place a premium on foreign corporations, by relieving them from the burdens that are charged on domestic corporations, which is contrary to the policy of our laws. People v. Roberts, 159 N. Y. 86, 53 N. E. 685, 45 L. R. A. 126.

. The defendant's counsel, however, strenuously insist that the Gebhard Case, 109 U. S. 527, 3 Sup. Ct. 363, 27 L. Ed. 1020, settles the law contrary to the result above arrived at. I do not so understand that decision. In the Gebhard Case the Canada Southern Railway Company was incorporated by the Legislature of the province of Ontario to build a railroad from the Detroit to the Niagara river and, for the purpose of building and equipping the same, executed and delivered in Canada a series of negotiable bonds payable in New York City, which were secured by a mortgage upon all of the property of said railway company, both real and personal, all of which was situated in the province of Ontario. The company became embarrassed financially, and unable to pay the coupons on the bonds as they fell due, and, for the purpose of procuring time to meet the same, executed and delivered to the bondholders what was called extension bonds, which were delivered on no new consideration, but merely as security for unpaid coupons. The company thereafter became insolvent, and, as the carrying out of the railroad project was of great importance to the people of Canada, a reorganization scheme was agreed upon between a joint committee of the directors and bondholders

whereby the whole bonded indebtedness was to be refunded in an issue of $14,000,000 bonds secured by a new mortgage, which was to be a first lien on the property of the company, the same to be exchanged for the old bonds at their face value without past-due coupons or extension bonds. This new issue of bonds was to bear a less rate of interest than the former issue, and the interest thereon was to be guaranteed by the New York Central & Hudson River Railroad Company. The arrangement thus made was assented to by a large majority of the old bondholders, and thereupon the Dominion Parliament passed what was known as the Canada Southern Arrangement Act, which approved of said scheme, declared the same binding on all the bondholders, and made said bond issue and mortgage a first lien on all the property of the company. The plaintiffs, who resided in New York, had purchased some of the old bonds, and refused to receive the new ones in exchange therefor. They thereupon brought action against the railway company upon the unpaid coupons and extension bonds given therefor, and the United States Supreme Court held they were not entitled to succeed.

The above statement shows the distinction that exists between that case and the present one. The Canada Southern Railway Company asked no permission to do business in the state of New York, and all its business was transacted in the Dominion of Canada. All of its property was located in that place, and the only contract it entered into consisted of the issuing of the bonds and the execution of the mortgage, all of which was done, and the same were delivered to mortgage trustees in Niagara Falls, in said dominion. These bonds doubtless were placed upon the market and were held and owned at various places throughout the United States and Canada. How and where the plaintiffs became holders of their bonds does not appear, but in my judgment that is utterly immaterial, as the transfer of negotiable securities does not constitute a new contract, but is merely a transfer of the right of action upon such security; the agreement of the maker being to pay the holder thereof, whoever it might be. In view of these facts, it seems to me that these bonds were essentially Canadian contracts, notwithstanding they were payable in New York City. They were made payable in that city doubtless as a matter of convenience, because New York City was the great financial center of the country. Under these circumstances the mere fact that they were payable in that place did not make them New York contracts. Bank of Georgia v. Lewin, 45 Barb. 340, 342, 343.

It is well settled that the mere fact that an instrument is made payable in a certain state does not make that state the place of performance, when the agreement in fact is to be carried out in another jurisdiction. Wayne County Sav. Bank v. Low, 81 N. Y. 566, 571, 37 Am. Rep. 533; Western Trans. & Coal Co. v. Kilderhouse, 87 N. Y. 431; Sheldon v. Haxtun, 91 N. Y. 124, 129; Staples v. Nott, 128 N. Y. 403, 407, 28 N. E. 515, 26 Am. St. Rep. 480; Tilden v. Blair, 88 U. S. (21 Wall.) 241, 22 L. Ed. 632. The case, therefore, comes within the well-settled rule that the laws of a foreign state will be given effect and enforced in our own state, when they do not conflict with our public policy and are not injurious to our citizens.

Chief Justice Waite, in whose opinion a majority of the court concurred, held that the arrangement scheme was not contrary to the policy of our laws, as it was in effect a composition in bankruptcy, which is here allowable. He also held that it was not injurious to our citizens, because it took the place of a foreclosure sale, and unless the scheme went through the bondholders and all others interested would suffer great losses. Therefore it was held that the true spirit of international comity required that it should be enforced in other jurisdictions. Justice Harlan, in a vigorous dissenting opinion, held that the arrangement was contrary to our public policy, did injustice to our citizens, and therefore international comity did not call upon our courts to enforce the same.

It is quite true that some things are said in the prevailing opinion which, if taken literally, might destroy the obligation of every contract made by a Canadian corporation. However, that the court intended to hold that a Canadian corporation could come into this state, ask and receive permission to do business here, and under such permission solicit business and make contracts, and then by act of Parliament become relieved from their contract obligations, which discharge would be binding and enforceable in our state, I cannot persuade myself to believe. Such a proposition would manifestly ignore the fact that the inviolability of contract rights is inherent in our Anglo-Saxon civilization and in a constitutional country governed by the principles of Magna Charta must strike the mind as being inconsistent with the fundamental doctrines of civil liberty.

On the contrary, I think what was said was intended to apply only to the facts then before the court which was that of a Canada contract made by a Canadian corporation, and therefore to be construed and given effect according to the Canadian laws; the only question being whether, in view of the importance of the work in which the corporation was engaged, and the consequences to the public, as well as to the bondholders, of a failure of the scheme proposed, it was contrary to our public policy to permit an enforcement of the same.

Nor do I think the decision in the Simmelink Case, 152 App. Div. 892, 136 N. Y. Supp. 527, which is pressed upon my attention by defendant's counsel, is at all controlling. If that decision was in point, it would be my duty to follow it, though decided by a divided court. This case, however, as I read it, is quite unlike the one now before the court. I have been furnished with the record, and see that there was no finding that it was a New York contract, and it is doubtful if there was sufficient evidence to support such a finding. On the contrary, the record shows an express finding that the certificate of insurance was issued to plaintiff at Toronto, Canada. The Simmelink Case could therefore be well held to be a Canadian contract, and governed by the laws of that Dominion, as was done in the Gebhard Case above cited. Herein that case differs from the Green Case, 206 N. Y. 591, 597, 100 N. E. 411, where there was a finding that the certificate was a New York contract, and therefore the rights of the parties must be determined according to the laws of this state.

My attention is also called to the case of Stockwell v. Supreme Court of the Independent Order of Foresters, 216 Fed. 205, where the

District Court of the United States, upon a similar state of facts, seems to have arrived at a different conclusion than that expressed in this opinion. It is sufficient for me to say that, while I entertain great respect for the distinguished jurist who wrote in that case, I think the decision there made involves a more rigid application of the principles of the Gebhard Case than is consistent with that decision and the settled law of this state.

Finally, the defendant's counsel argue that the purpose of the special assessment was to equalize the amounts paid by the pre-99 members with the amounts paid by those who joined after that date, and also, if the assessment is not allowed to stand, the defendant will be unable in the future to meet its obligations and will be obliged to go into liquidation. However desirable it might be from a strictly moral standpoint to have all members contribute equally to the funds of the defendant, the rights of the parties are to be determined in a forum of law, not that of conscience, and, having made a contract, the defendant cannot successfully urge as a reason for not fulfilling the same that it does injustice to other persons with whom defendant has contractual relations. Nor is the fact that defendant may have made an improvident contract any reason for violating its obligations.

So far as any alleged deficiency is concerned, it is quite manifest that it arises from an attempt on the part of defendant to abandon the purely assessment plan on which the defendant started out, depending on extra assessments to meet emergencies, and to transform itself into an insurance association doing business on the old-line system, whereby a reserve fund is created which, in connection with the regular monthly assessments, is sufficient to meet all the obligations of the company. This is allowable, if it does not interfere with vested rights, but not otherwise. Wright v. Minnesota Mutual Life Ins. Co., 193 U. S. 657, 24 Sup. Ct. 549, 48 L. Ed. 832.

But, treating the actuarial report as an actual deficiency, the evidence shows that before the raise in rates in 1908 said deficiency was $55,000,000, which, under the increased rates of that year was reduced in 1912 to less than $24,000,000, or a reduction of nearly 60 per cent. in four years. It also appears that in 1913 there was an accumulated surplus from the whole membership, after paying all death claims and other charges and expenses, of over $300,000. There is no apparent reason given why this increase in the surplus will not continue. The question whether the surplus fund in connection with assessments levied under the rates established in 1908 will not be sufficient to meet the defendant's obligations is at best problematical, depending on the future death rate, the influx of new members, the number of extra assessments levied, and the economy exercised in conducting the affairs of the defendant. At all events, it will be many years before the defendant's present surplus of over $20,000,000 will be exhausted, and it be compelled to discontinue business. It may also be added that the same argument was used in the Wright Case, 196 N. Y. 391, 89 N. E. 1078, 31 L. R. A. (N. S.) 423, 134 Am. St. Rep. 838, and held to be not forceful by the Court of Appeals.

I conclude that the action of defendant in making the special assessment in question and declaring the same a lien on plaintiff's certificate

of insurance impaired the obligation of the contract defendant made, and was consequently invalid and void, as being in violation of the vested contract rights of plaintiff. The relief asked seems to be well within the jurisdiction of a court of equity. Langan v. American Legion of Honor, 174 N. Y. 267, 66 N. E. 932. A decree should, therefore, be made in favor of plaintiff, granting him such relief, together with costs.

Findings may be prepared in accordance with this opinion, and, if not assented to by counsel, settled before me on five days' notice. The plaintiff's attorney will serve a copy of this opinion with the proposed findings.

Judgment accordingly.